**Connell Foley LLP**
One Newark Center
1085 Raymond Boulevard, 19th Floor
Newark, New Jersey 07102
(973) 436-5800
Attorneys for Plaintiff, Baymont Franchise Systems, Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BAYMONT FRANCHISE SYSTEMS, INC., a Delaware Corporation, | Civil Action No. 24- |
| Plaintiff, | |
| v. | **COMPLAINT** |
| TANZAM LLC, a Louisiana Limited Liability Company; GIRISH PATEL, an individual; ARCHNA PATEL, an individual; and KIRIT PATEL, an individual, | |
| Defendants. | |

Plaintiff Baymont Franchise Systems, Inc., by its attorneys, Connell Foley LLP, complaining of defendants, Tanzam LLC, Girish Patel, Archna Patel, and Kirit Patel (collectively, "Defendants"), says:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Baymont Franchise Systems, Inc. ("BFS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Tanzam, LLC ("Tanzam"), on information and belief, is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal place of business at 42309 South Morrison Boulevard, Hammond, Louisiana 70403.

3.      Defendant Girish Patel ("G. Patel"), on information and belief, is a member of Tanzam and a citizen of the State of Louisiana, having an address at 42309 South Morrison Boulevard, Hammond, Louisiana 70403.

4.      Defendant Archna Patel ("A. Patel"), on information and belief, is a member of Tanzam and a citizen of the State of Louisiana, having an address at 42309 South Morrison Boulevard, Hammond, Louisiana 70403.

5.      Defendant Defendant Archna Patel ("A. Patel"), on information and belief, is a member of Tanzam and a citizen of the State of Louisiana, having an address at 42309 South Morrison Boulevard, Hammond, Louisiana 70403.

6.      Upon information and belief, G. Patel, A. Patel, and K. Patel are the only constituent members of Tanzam.

7.      The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and defendants are citizens of different states and the amount in controversy in this matter, exclusive of interests and costs, exceeds the sum of $75,000.

9.      This Court has personal jurisdiction over Tanzam by virtue of, among other things, section 17.6.3 of the February 8, 2018 franchise agreement by and between Tanzam and BFS (the "Franchise Agreement"), described in more detail below, pursuant to which Tanzam has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

10.     This Court has personal jurisdiction over G. Patel, A. Patel, and K. Patel by virtue of, among other things, the terms of a Guaranty (the "Guaranty"), described in more detail below, pursuant to which G. Patel, A. Patel, and K. Patel acknowledged that they were personally bound by section 17 of the Franchise Agreement.

11.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Tanzam of any objection to venue in this District.

**ALLEGATIONS COMMON TO ALL COUNTS**

**<u>The Agreements Between the Parties</u>**

12.     On or about February 8, 2018, BFS entered into the Franchise Agreement with Tanzam for the operation of a 59-room Baymont® guest lodging facility located at 42309 South Morrison Boulevard, Hammond, Louisiana 70403, designated as Site No. 02002-11589-06 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as <u>Exhibit A</u>.

13.     On or about February 8, 2018, BFS, Tanzam entered into the SynXis Agreement, which governed Tanzam's access to and use of certain computer programs, applications, features, and services, as well as any and all modifications, corrections, updates, and enhancements to same. A true copy of the SynXis Agreement is attached hereto as <u>Exhibit B</u>.

14.     Pursuant to section 5 of the Franchise Agreement, Tanzam was obligated to operate a Baymont® guest lodging facility for a twenty-year term.

15.     Pursuant to section 7, section 18.1, and Schedule C of the Franchise Agreement, and section 5 and Schedule 5.1 of the SynXis Agreement, Tanzam was required to make certain periodic payments to BFS for royalties, system assessment fees, taxes, interest, SynXis fees, and other fees (collectively, "Recurring Fees").

3

16.     Pursuant to section 7.3 of the Franchise Agreement, Tanzam agreed that interest is payable "on any past due amount payable to [BFS] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

17.     Pursuant to section 3.6.4 of the Franchise Agreement, Tanzam was required to prepare and submit monthly reports to BFS disclosing, among other things, the amount of gross room revenue earned by Tanzam at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to BFS.

18.     Pursuant to section 3.6 of the Franchise Agreement, Tanzam agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Tanzam agreed to allow BFS to examine, audit, and make copies of the entries in these books, records, and accounts.

19.     Pursuant to section 11.2 of the Franchise Agreement, BFS could terminate the Franchise Agreement, with notice to Tanzam, if Tanzam: (a) discontinued operating the Facility as a Baymont® guest lodging establishment, and/or (b) lost possession or the right to possession of the Facility.

20.     Pursuant to section 12.1 of the Franchise Agreement, Tanzam agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to BFS in accordance with a formula specified in the Franchise Agreement.

21.     Section 18.2 of the Franchise Agreement specifically set liquidated damages at $1,000.00 for each guest room of the Facility that Tanzam was authorized to operate at the time of termination.

22.     Pursuant to section 17.4 of the Franchise Agreement, Tanzam agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

23.     Effective as of the date of the Franchise Agreement, G. Patel, A. Patel, and K. Patel provided BFS with a Guaranty of Tanzam's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as <u>Exhibit C</u>.[1]

24.     Pursuant to the terms of the Guaranty, G. Patel, A. Patel, and K. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause [Tanzam] to perform, each unpaid or unperformed obligation of [Tanzam] under the [Franchise] Agreement."

25.     Pursuant to the terms of the Guaranty, G. Patel, A. Patel, and K. Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by BFS in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

**<u>The Defendants' Premature Termination of the Franchise Agreement</u>**

26.     On or about November 29, 2023, Tanzam unilaterally terminated the Franchise Agreement by ceasing to operate the Facility as a Baymont® guest lodging facility.

27.     By letter dated December 21, 2023, a true copy of which is attached as <u>Exhibit E</u>, BFS acknowledged Tanzam's unilateral termination of the Franchise Agreement, effective November 29, 2023, and advised Tanzam that it was required to pay to BFS as liquidated damages

---

[1] By amendment to the Franchise Agreement dated March 15, 2018, a true copy of which is attached hereto as <u>Exhibit D</u>, Tanzam amended the Franchise Agreement by revising the equity ownership interest in Tanzam as follows:  G. Patel  33.3% to 45%;  A. Patel 33.3% to 45%; and K. Patel to 33.3% to 10%.

for premature termination the sum of $59,000.00 as required under sections 12.1 and 18.2 of the Franchise Agreement and all outstanding Recurring Fees through the date of termination.

28.     BFS has satisfied all of its obligations under the Franchise Agreement, including without limitation, providing Tanzam the right to use the Baymont® trade name, trademarks, and service marks.

### FIRST COUNT

29.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 28 of the Complaint.

30.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Tanzam agreed to allow BFS to examine, audit, and make copies of Tanzam's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

31.     The calculation of the monetary amounts sought by BFS in this action is based on the gross room revenue information supplied to BFS by Tanzam and, to the extent there has been non-reporting, BFS's estimate as to the gross room revenue earned by Tanzam.

32.     The accuracy of BFS's estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, statements and books, and other financial materials from Tanzam.

**WHEREFORE**, BFS demands judgment ordering that Tanzam account to BFS for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Baymont® Marks from the inception through the date of judgment herein.

### SECOND COUNT

33.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 32 of the Complaint.

6

34.     On or about November 29, 2023, Tanzam unilaterally terminated the Franchise Agreement by ceasing to operate the Facility as a Baymont® guest lodging facility.

35.     By letter dated December 21, 2023, BFS acknowledged Tanzam's unilateral termination of the Franchise Agreement, effective November 29, 2023.

36.     Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to the action of the Franchisee, Tanzam shall pay liquidated damages to BFS within thirty (30) days of termination.

37.     Section 18.2 of the Franchise Agreement specifically set liquidated damages at $1,000.00 for each guest room of the Facility that Tanzam was authorized to operate at the time of termination.

38.     As a result of the premature termination of the Franchise Agreement, Tanzam was obligated to pay BFS liquidated damages in the amount of $59,000.00, as calculated pursuant to sections 12.1 and 18.2 of the Franchise Agreement.

39.     Notwithstanding BFS's demand for payment, Tanzam has failed to pay BFS the liquidated damages as required in sections 12.1 and 18.2 of the Franchise Agreement.

40.     BFS has been damaged by Tanzam's failure to pay liquidated damages.

**WHEREFORE**, BFS demands judgment against Tanzam for liquidated damages in the amount of $59,000.00, together with interest, attorneys' fees, and costs of suit.

<u>**THIRD COUNT**</u>

41.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 40 of the Complaint.

42.     By virtue of the premature termination of the Franchise Agreement, BFS sustained a loss of future revenue over the remainder of the twenty-year term of the Franchise Agreement.

7

43.     If the Court determines that Tanzam is not liable to pay BFS liquidated damages as required by sections 12.1 and 18.2 of the Franchise Agreement then, in the alternative, Tanzam is liable to BFS for actual damages for the premature termination of the Franchise Agreement.

44.     BFS has been damaged by Tanzam's breach of its obligation to operate a Baymont® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, BFS demands judgment against Tanzam for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

45.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 44 of the Complaint.

46.     Pursuant to section 7, section 18.1, and Schedule C of the Franchise Agreement and section 5 and Schedule 5.1 of the SynXis Agreement, Tanzam was obligated to remit Recurring Fees to BFS.

47.     Despite their obligation to do so, Tanzam failed to pay certain of the outstanding Recurring Fees due and owing under the Franchise Agreement and SynXis Agreement in the current amount of $28,514.81.

48.     Tanzam's failure to remit the agreed outstanding Recurring Fees constitutes a breach of the Franchise Agreement and SynXis Agreement and has damaged BFS.

**WHEREFORE**, BFS demands judgment against Tanzam for the outstanding Recurring Fees due and owing under the Franchise Agreement, in the current amount of $28,514.81, together with interest, attorneys' fees, and costs of suit.

15493400-1

## FIFTH COUNT

49.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 48 of the Complaint.

50.     At the time of the termination of the Franchise Agreement, Tanzam was obligated to pay BFS Recurring Fees.

51.     Despite their obligation to do so, Tanzam failed to pay certain of the outstanding Recurring Fees due and owing under the Franchise Agreement and SynXis Agreement in the current amount of $28,514.81.

52.     Tanzam's failure to compensate BFS constitutes unjust enrichment and has damaged BFS.

**WHEREFORE**, BFS demands judgment against Tanzam for the outstanding Recurring Fees due and owing under the Franchise Agreement, in the current amount of $28,514.81, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

53.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 52 of the Complaint.

54.     Pursuant to the terms of the Guaranty, G. Patel, A. Patel, and K. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Tanzam under the Franchise Agreement.

55.     Despite their obligation to do so, G. Patel, A. Patel, and K. Patel have failed to make any payments or perform or cause Tanzam to perform each obligation required under the Franchise Agreement.

15493400-1

56.     Pursuant to the Guaranty, G. Patel, A. Patel and K. Patel are liable to BFS for Tanzam's liquidated damages in the amount of $59,000.00, or actual damages in an amount to be determined at trial, and Tanzam's outstanding Recurring Fees due and owing under the Franchise Agreement, in the current amount of $28,514.81.

**WHEREFORE**, BFS demands judgment against G. Patel, A. Patel, and K. Patel for damages in the amount of all liquidated damages, or actual damages, and outstanding Recurring Fees due and owing under the Franchise Agreement and Guaranty.

**Connell Foley LLP**
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
        Bryan P. Couch

Dated: July 22, 2024

10

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

**Connell Foley LLP**
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
       Bryan P. Couch

Dated: July 22, 2024

15493400-1

# EXHIBIT A

Location HAMMOND, LA
Entity No 11589-06
Unit No 02002

## BAYMONT FRANCHISE SYSTEMS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement") dated February 8, 20 18 is between BAYMONT FRANCHISE SYSTEMS, INC a Delaware corporation ( we", "our or us" ) and TANZAM LLC, a(an) Louisiana limited liability company ( you" ) The definitions of capitalized terms are found in Appendix A In consideration of the following mutual promises, the parties agree as follows

**1. Franchise.** We have the exclusive right to franchise to you the distinctive Baymont System for providing transient guest lodging services We grant to you and you accept the Franchise, effective and beginning on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination The Franchise is effective only at the Location and may not be transferred or relocated You will call the Facility a BAYMONT Inn & Suites You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term

**2. Protected Territory.** We will not own, operate, lease, manage, franchise or license anyone but you to operate a Chain Facility in the Protected Territory', as defined below, while this Agreement is in effect We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any timeshare resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed You acknowledge that the Protected Territory fairly represents the Facility s trading area and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain

1

Facility on the Facility or its performance  You further acknowledge and agree that notwithstanding the foregoing, we may operate lease, manage, or license any other party to operate a Chain Facility in the Protected Territory beginning (a) six months prior to the expiration of this Agreement, or (b) as of the date that a date for the premature termination of this Agreement has been confirmed in writing by us  The covenants in this Section are mutually dependent, if you breach this Section, your Protected Territory will be the Location only  The Protected Territory means all the area within a circle created by a five (5) mile radius whose centerpoint is the front door of the Facility

### 3   Your Improvement and Operating Obligations.

3 1 **Pre-Opening Improvements.**  You must select, acquire, construct and/or renovate the Facility as provided in Schedule D

3 2 **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards  You will not operate a Food and Beverage service without our prior written consent, except for a complimentary coffee service/continental breakfast in accordance with System Standards  You will keep the Facility in a clean, neat, and sanitary condition  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards  The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities  The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual  The Facility will follow standard industry practices for safeguarding cardholder information, applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose  You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay  Your front desk operation, telephone system, parking lot, swimming pool (if any) and other guest service facilities may not be shared with or used by guests of another lodging or housing facility  You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement  Upon our reasonable request, you will provide us with then-current copies of the documents evidencing your ownership of, or right to possess, the Facility and/or the real property upon which the Facility is located, and a complete and accurate list of all of your owners and their Equity Interests

3 3 **Training.**  You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4 1 we designate as mandatory for franchisees and general managers respectively  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement  You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4 1, and all travel,

2

lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility

### 3 4 Marketing.

3 4 1   You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs   You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System   You will comply with our rules and standards for participation  and will honor reservations and commitments to guests and travel industry participants   You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards   You may implement, at your option and expense, your own local advertising   Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication   You will stop using any non-conforming  out-dated or misleading advertising materials if we so request

3 4 2   You must participate in any regional marketing, training or management alliance or cooperative of Chain Lodging franchisees formed to serve the Chain Facilities in your area   We may assist the cooperative with collecting contributions   You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due

3 4 3   The Facility must participate in all mandatory Internet and distribution marketing activities and programs in accordance with the System Standards Manual, including any arrangements we make with third party distribution channels   You must provide us with information about the Facility and use our approved photographer for taking photographs of the Facility for posting on the Chain Websites, third party travel websites and various marketing media   The content you provide us or use yourself for any Internet or distribution marketing activities must be true, correct and accurate, and you will promptly notify us in writing, in accordance with our processes that are then in effect  when any correction to the content becomes necessary   You must promptly modify, at our request, the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards   You will discontinue any Internet or distribution marketing activities that conflict, in our reasonable discretion, with Chain-wide Internet or distribution marketing activities   You must honor the terms of any participation agreement you sign for Internet or distribution marketing activities   You will pay when due any fees, commissions, charges and reimbursements relating to Internet or distribution marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis   We may suspend the Facility s participation in Internet and/or distribution marketing activities if you default under this Agreement

3 4 4   You will participate in the Wyndham Rewards program or any successor guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C   The Wyndham Rewards Front Desk Guide sets forth additional standards, which you agree to follow   The Front Desk Guide, including fees

3

assessed and reimbursements rates, may be revised by us or our affiliates at any time upon thirty (30) days' prior notice

**3 5 Governmental Matters**   You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote   You will pay when due or properly contest all federal, state and local payroll withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes assessments, fees charges, penalties and interest, and will file when due all governmental returns, notices and other filings   You will comply with all applicable federal state and local laws, regulations and orders applicable to you and/or the Facility including those combating terrorism such as the USA Patriot Act and Executive Order 13224

**3 6 Financial Books & Records; Audits.**

3 6 1   The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ('GAAP') and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards   You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement

3 6 2   Upon our request you will send to us copies of financial statements tax returns and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards   We may notify you of a date on which we propose to audit the Facility's books and records at the Facility   You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date   You need to inform us where the books and records will be produced   You need to produce for our auditors at the confirmed time and place for the audit the books records, tax returns and financial statements for the Facility   We may also perform an audit of the Facility's books and records without advance notice   Your staff must cooperate with and assist our auditors to perform any audit we conduct

3 6 3   We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3 6 2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit   Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3 6, an  Accounting Procedure Notice "  The Accounting Procedure Notice requires that you obtain and deliver to us  within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member

4

of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year. You must also pay any deficiency in Recurring Fees, any Audit Fee, as defined in Section 4 8, we assess you for your default of Section 3 6 as described in Section 4 8, and/or other charges we identify and invoice as a result of the audit.

3 6 4   You will, at your expense, prepare and submit to us by the third day of each month, a statement in the form prescribed by us accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require. You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time.

3 7 **Inspections**   You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the representative performing the inspection. If the Facility fails an inspection you refuse to cooperate with our representative or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our representative incurs for a reinspection. You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also include the results of paper and electronic customer satisfaction surveys of your guests as well as unsolicited feedback received from your guests in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys. We may, at our discretion, implement a chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable third party. You must provide free lodging for the inspector(s) when he/she visits your Facility.

3 8 **Insurance.**   You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise your liability insurance policies will name as additional insureds Baymont Franchise Systems, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and their current and former subsidiaries, affiliates, successors and assigns as their interests may appear. All policies must be primary and non-contributory with or excess of any insurance coverage that may be available to an additional insured. You must submit to us, annually, a copy of the certificate of or other evidence of renewal or extension of each such insurance policy as required by the System Standards.

3 9 **Conferences.**   You (or your representative with executive authority, if you are an entity) will attend each Chain conference and pay the Conference Fee we set for Chain Lodging franchisees, if and when we determine to hold a Chain conference. The Chain conference may be held as part of a Wyndham Hotel Group, LLC multi-brand conference with special sessions and programs for

5

our Chain only  Mandatory recurrent training for franchisees and managers described in Section 4 1 4 may be held at a conference  The fee will be the same for all Chain Facilities that we franchise in the United States  You will receive reasonable notice of a Chain Lodging conference  We will invoice and charge you for the Conference Fee even if you do not attend the Chain Conference

3 10    **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks  such as signage, only from suppliers we approve  You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards

3 11    **Good Will.** You will use reasonable efforts to protect  maintain and promote the name ` Baymont  and its distinguishing characteristics  and the other Marks  You will not permit or allow your officers, directors, principals, employees, representatives  or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System  You agree that, in event that you or any of your principals or Guarantors is or is discovered to have been, convicted of a felony or any other offense likely to reflect adversely upon us  the System or the Marks  such conviction is a material, incurable breach of this Section  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners  You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities  You shall use your best efforts to promote usage of other Chain Facilities by members of the public  Except as provided in the System Standards Manual or if you obtain our prior written consent, which we may withhold in our sole discretion, neither you nor the Facility shall promote or advertise any competing business at the Facility including  but not limited to, any other guest lodging facility, time share resort  vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business

3 12    **Facility Modifications.** You may not materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) until you receive our prior written consent, which we will not unreasonably withhold or delay  You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility before you begin construction of any expansion  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards

3 13    **Courtesy Lodging.** You will provide lodging at the  Employee Rate ` established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives and members of their immediate family, but not more than three (3) standard guest rooms at the same time

3 14    **Material Renovations.** Beginning five years after the Opening Date, we may issue a `Material Renovation Notice  to you that will specify reasonable Facility upgrading and renovation

6

requirements (a "Material Renovation") for the Facility to be commenced no sooner than 90 days after the notice is issued. You will perform the Material Renovations as and when the Material Renovation Notice requires in a time period of 120 days or by the date specified in the Material Renovation Notice whichever is longer. We will not issue a Material Renovation Notice within five years after the date of a prior Material Renovation Notice.

3 15   **Technology Standards & Communications.** You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment. You must purchase the computer system and other equipment and software that we specify, including preventative maintenance software. We may modify System Standards to require new or updated technology at all Chain Facilities. At our request, you shall participate in any intranet or extranet system developed for use in connection with the System. Such intranet or extranet system may be combined with that of our affiliates. You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things (a) confidentiality requirements for materials transmitted via such system (b) password protocols and other security precautions, (c) grounds and procedures for our suspension or revocation of access to the system by you and others and (d) a privacy policy governing the parties access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system. You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

**4.   Our Operating and Service Obligations.** We will provide you with the following services and assistance.

4 1 **Training**. We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager training, re-certification training, remedial training and supplemental training.

4 1 1   **General Manager Certification Training.** We will offer at our corporate offices or at another location we designate a General Manager Certification Training Program. The program will not exceed two weeks in duration and will cover such topics as operating a Chain Facility, marketing and sales, financial management, guest services and people management. We may administer certain diagnostic tests via the Internet to measure the skill set of your general manager and based in part of his/her score, offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date. Any replacement general manager must complete the training program to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in the training program within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete the training even if you employ managers at other Chain Facilities who have already received this training. If this is your first System franchise, or you have not attended training within the last two (2) years, in addition to your general manager, you (or a person with executive authority if you are an entity) must attend the training by the Opening Date. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend

7

training, but may choose to do so at their option  We charge you tuition for training for your general manager which is payable as part of the Integration Services Fee set forth on Schedule D  If he/she does not attend the training within 90 days after the Opening Date, and for any replacement general manager, you must pay a separate tuition at the rate then in effect for the program when your manager attends the program  If you are required to attend the training, we will charge you tuition of $1,400 which is payable by the scheduled date for the program  We may charge you full or discounted tuition for refresher training for your general manager or for additional staff members who attend the training program with your general manager  We will charge the then in effect discounted tuition for any additional staff members who attend the training program with your general manager  We may charge you No-Show Fees or Cancellation Fees if you  your general manager or any other member of your staff (i) fails to register for and/or attend the training program by the required deadline, (ii) registers, but is a  no show , for training, or (iii) fails to notify us at least seven (7) days in advance that he/she will be unable to attend a scheduled program  This is in addition to the tuition you must pay us for your general manager at the then current rate when he/she attends training  You must also pay for your, your general manager and/or additional staff member's travel, lodging  meals, incidental expenses  compensation and benefits

4 1 2  **Remedial Training.**  We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F score on quality assurance electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our customer care department or posted on third-party travel websites, distribution channels, blogs, social networks and other forums, as determined by us in our sole discretion  This training may be offered at our corporate offices, at a regional location, on-line or at the Facility  The training may be in the form of one or more classes held at different times and locations as we may require  You must pay the tuition in effect for this program when it is offered to you  If the training is provided at the Facility, you must provide lodging for our trainers  In addition, if at the time of your quality assurance inspection, you receive (i) a failure rating on guest room cleanliness and (ii) an average quality assurance score of F on cleanliness of guestroom category or cleanliness of bathroom category (based on a minimum of 10 electronic quality assurance guest surveys), then we may require you to take a one day, on-site remedial class on housekeeping within 60 days after the inspection  The tuition for an on-line class is currently $250, but is subject to increase in the future  The fee for an on-site customer experience assessment or training class is currently $1,500, but is subject to increase in the future

4 1 3  **Supplemental Training**  You must subscribe to our e-learning modules and other educational resources, accessible by you and your staff via the Internet, and pay us the annual fee for this service  All general managers must complete recertification training at such intervals as we may establish in the System Standards Manual  You must pay us the tuition then in effect for the program  We may offer other mandatory or optional training programs for reasonable tuition or without charge  The above training could be offered in our corporate offices or other locations or held in conjunction with a Chain lodging conference  You will pay for your representative's travel lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training  We may offer, rent or sell to you video tapes  computer discs or other on-site

8

training aids and materials, or require you to buy them at reasonable prices  We may also offer Internet-based training via the Chain's intranet website

**4 1 4   No Show and Cancellation Fees.**  If you or your general manager, or any other member of your staff you designate registers for a training program but fails to attend such program within the required time period, or fails to attend a training program as scheduled without notifying us in advance, we may charge you a No-Show Fee of 50% of the tuition for the program  If you, your general manager or any other member of your staff does not register for and attend any training they are scheduled to attend whether such attendance is required by this Section 4 1 or System Standards or is optional, we may charge you a fee of 100% of the tuition for the program  If you, your general manager, or any other member of your staff cancels participation in any training program less than seven (7) days before it is scheduled to be held, we may charge you a Cancellation Fee of 25% of the tuition for the program  No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program  We may assess you additional No-Show or Cancellation Fees for continued failures by you under this Section 4 1

**4 2 Reservation System**  We will operate and maintain (directly or by contracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion  We will use the Basic Reservation Fee included in the System Assessment Fees for the acquisition development support, equipping, maintenance, improvement and operation of the Reservation System  We or our approved supplier will provide software maintenance and support for the software we or an approved supplier license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us, an affiliate or the supplier, as applicable  During the Term  the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation   The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology  You shall own all Guest Information within your possession or any service provider holding such information on your behalf, and we shall own all Guest Information within our possession or any service provider holding such information on our behalf  To the extent that you and we both possess identical Guest Information, your and our respective ownership rights with regard to such Guest Information shall be separate and independent from one another  We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties

**4 3 Marketing.**

**4 3 1**  We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs, and related activities as we deem appropriate  We will determine in our discretion (i) The nature and type of media placement, (ii) The allocation (if any) among international, national, regional and local markets, and (iii) The nature and type of advertising copy, other materials and programs  We or an affiliate may be reimbursed from System Assessment Fees for the reasonable direct and indirect costs overhead or other expenses of providing marketing services  We are not obligated to supplement or advance funds available from System franchisees

9

ocuSign Envelope ID 02885DC9 8C55-     BBFD-7063E11CFE68

to pay for marketing activities  We do not promise that the Facility or you will benefit directly or proportionately from marketing activities

4 3 2   We may, at our discretion, implement special international  national, regional or local promotional programs (which may or may not include the Facility) as we deem appropriate and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials  direct and indirect costs

4 3 3   We may, at our discretion  implement ' group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like  possibly for an additional fee

4 4 **Purchasing.**  We may offer optional assistance to you with purchasing items or services used at or in the Facility  Our affiliates may offer this service on our behalf  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts   We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards

4 5 **The System.**  We will control and establish requirements for all aspects of the System  We may in our discretion, change  delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances  We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation where it appears  We will not be liable to you for any expenses, losses or damages you may sustain as a result of any Mark addition, modification, substitution or discontinuation

4 6 **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during any visits by our employees to the Facility, through the System Standards Manual, at training sessions and during conferences and meetings we conduct   We will provide telephone and mail consultation on Facility operation and marketing through our representatives  We will offer you access to any Internet website we may maintain to provide Chain Facility franchisees with information and services subject to any rules  policies and procedures we establish for its use and access and to this Agreement  We may limit or deny access to any such website while you are in default under this Agreement

4 7 **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium  You will at all times comply with the System Standards   You acknowledge that the System Standards and the System Standards Manual are designed to protect the System and the Marks, and not to control the day-to-day operation of your business   We will provide you with access to the System Standards Manual promptly after we sign this Agreement  We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time

10

4 8 **Inspections and Audits**   We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3 6   We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection   We may impose a reinspection fee and will charge you for our costs as provided in Section 3 7   In connection with an audit, you will pay us any understated amount plus interest under Section 3 6   If the understated amount is three percent (3%) or more of the total amount owed during a six month period, you will also pay us an "Audit Fee" equal to the costs and expenses associated with the audit   Our inspections are solely for the purposes of checking compliance with System Standards

5.   **Term.**  The Term begins on the Effective Date and expires at the end of the twentieth (20th) Franchise Year   NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS  However, if applicable law requires us to offer renewal rights, and you desire to renew this Agreement, then you will apply for a renewal franchise agreement at least six months, but not more than nine months, prior to the expiration date, and subject to such applicable law  you will have to meet our then-current requirements for applicants seeking a franchise agreement, which may include (i) executing our then-current form of license and other agreements, which license and other agreements may contain materially different terms and provisions (such as operating standards and fees) from those contained in this Agreement, (ii) executing a general release of us and our affiliates, in form and substance satisfactory to us, (iii) completing a property improvement plan, and (iv) paying a standard renewal fee, if then applicable

6   **Application and Initial Fees.**   You must pay us a non-refundable Application Fee of $2,500 00, which shall be applied to your Initial or Relicense Fee   If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee   If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee   The amount of your Initial or Relicense Fee is $26,000 00, $2,500 00, of which shall be applied from your Application Fee, and the remainder paid when you sign this Agreement and is fully earned when we sign this Agreement

7.  **Recurring Fees, Taxes and Interest.**

7 1 You will pay us certain   Recurring Fees ` each month of the Term payable in U S  dollars (or such other currency as we may direct if the Facility is outside the United States)   The Recurring Fees described in sections 7 1 1 and 7 1 2 are payable three days after the month in which they accrue without billing or demand   Other Recurring Fees are payable at the times set forth in the Systems Standards  Recurring Fees include the following

7 1 1   A  Royalty  equal to five percent (5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term

7 1 2   A  System Assessment Fee" as stated in Schedule C, including a "Marketing Contribution for advertising  marketing and training  and a "Basic Reservation Fee" for the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term,

11

including during periods when reservation service is suspended  We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs overhead or other expenses of providing marketing, training and reservation services  We may earn a profit on activities supported by the System Assessment Fee  You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as travel and other sales agent commissions paid for certain reservation and marketing services to generate reservations at the Facility plus a reasonable service charge, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Chain Websites, and/or other reservation systems, distribution channels and networks, and fees for additional services and programs  We may charge Chain Facilities using the System outside the United States for reservation service using a different formula  We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C

7 2 You will pay to us  Taxes  equal to any federal, state or local sales gross receipts, use value added, excise or similar taxes assessed against us on the Recurring Fees and basic charges by the jurisdictions where the Facility is located but not including any income tax franchise or other similar tax for our privilege of doing business in your State  You will pay Taxes to us when due

7 3  Interest  is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1 5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid

7 4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a  Relicense Fee  equal to the Initial Fee we would then charge a new franchisee for the Facility

7 5 You will report and pay to us all Recurring Fees and other fees and charges on-line via our self-service Electronic Invoice Presentment and Payment tool ( WynPay") accessible through our Chain intranet  In the WynPay on-line environment, payments can be made either through the electronic check payment channel or the credit card payment channel  We reserve the right to change, from time to time, the technologies or other means for reporting and paying fees to us by amending the System Standards Manual

## 8.  Indemnifications.

8 1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven  You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further

12

appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury  This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property

8 2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee  You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys fees incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest  We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters

8 3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret patent copyright trademark service mark or trade name  You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you  You will cooperate with our defense and resolution of the claim  We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others

## 9.  **Your Assignments, Transfers and Conveyances.**

9 1 **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity)  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you  You may finance the Facility and grant a lien, security interest or encumbrance on it (but not in this Agreement) without notice to us or our consent  If a Transfer is to occur, the transferor or you must comply with Section 9 3  Your Franchise is subject to termination when the Transfer occurs  The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility  The transferee may not operate the Facility under the System, and you are responsible for performing the post-Termination obligations in Section 13  You and your owners may, only with our prior written consent and after you comply with Sections 9 3 and 9 6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise  Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers

9 2 **Financing Documents.**  Neither you, nor any of your Equity Interest owners, shall represent in any proposed financing arrangement to any proposed lender or participant in a private or public investment offering that we or any of our affiliates are or shall be in any way responsible for your obligations or financial projections, if any, set forth in such financing arrangement or investment offering or that we or any of our affiliates are or shall be participating in such private or public investment offering  In addition, any proposed financing arrangement where the service mark  Baymont Inn & Suites' appears, or a reference to this Agreement appears  shall contain a

13

disclaimer in bold face type substantially as follows   THE BORROWER IS A PARTY TO AN AGREEMENT WITH BAYMONT FRANCHISE SYSTEMS, INC TO OPERATE HOTELS USING THE SERVICE MARK ˙BAYMONT INN & SUITES˙ NEITHER BAYMONT FRANCHISE SYSTEMS, INC NOR ITS AFFILIATES OWN ANY SUCH HOTELS OR ARE A PARTY TO THIS FINANCING AND HAVE NOT PROVIDED OR REVIEWED, AND ARE NOT RESPONSIBLE FOR ANY DISCLOSURES OR OTHER INFORMATION SET FORTH HEREIN   Also, at least fifteen (15) days prior to closing such financing, you shall submit to us a written statement certifying that you have not misrepresented or overstated your relationship with us and our affiliates or your rights to use the Marks

9 3 **Conditions.** We may condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions, however, we will not unreasonably withhold delay or condition our consent to a Transfer if the Facility is then financed under a program in which the United States Small Business Administration ( SBA ) guarantees the financing or its repayment   If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine   We will provide a Punch List of improvements we will require after we receive the transferee's Application   We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or, in the alternative, condition our approval of the Transfer limiting the transferee's term to the balance of your Term or adding a right to terminate without cause exercisable by either party after a period of time has elapsed   Our consent to the transaction will not be effective until these conditions are satisfied   If we do not approve the Transfer, we may, in our sole discretion, allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12 1 at the same rate as you would pay if the termination occurred before the Opening Date   Such payment would be due and payable when you transfer possession of the Facility   We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your Owners, your affiliates, the transferee its owners and affiliates, under this Agreement or otherwise   Our consent to a transfer is not a waiver of (i) any claims we may have against you, or (ii) our right to demand strict compliance from the Transferee with the terms of its agreement

9 4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent renovating the Facility or paying a Relicense Fee or Application Fee   No Transfer will be deemed to occur   You also must not be in default and you must comply with the application and notice procedures specified in Sections 9 3 and 9 6   Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees   No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement   You must comply with this Section if you transfer the Facility to a Permitted Transferee   A transfer resulting from a death may occur even if you are in default under this Agreement

14

9 5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained will be void, as between you and us   You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility

9 6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction   You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility   We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days   You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer or a change in the ownership of the Facility if you are not its owner   You will provide us with lists of the names, addresses, and ownership percentages of your Owner(s) at our request

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent   We will have no obligations to you with respect to any assigned right or duty after you are notified that our transferee has assumed such rights or duties under this Agreement except those that arose before we assign this Agreement

## 11. Default and Termination.

11 1    **Default.** In addition to the matters identified in Sections 3 1 and 3 6, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or under any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement   If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below) then we may terminate this Agreement by written notice to you under Section 11 2   We will not exercise our right to terminate if you have completely cured your default during the time allowed for cure, or until any waiting period required by law has elapsed   In the case of a default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so  and the default does not relate to health or safety, we may  in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection   If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection   We may terminate this Agreement and any or all rights granted hereunder if you do not timely perform that improvement agreement

11 2    **Termination.** We may terminate this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure

15

a default as provided in Section 11 1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation (2) you discontinue operating the Facility as a Chain Facility, (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business (8) you, any guarantor or any of your Owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed (11) you or any of your Owners contest in court the ownership or right to franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests

## 11 3    Casualty and Condemnation.

11 3 1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available  You will give us information on the availability of guest rooms and the Facility s ability to honor advance reservations  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty  This restoration will be completed within 180 days after the Casualty  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first  If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13  You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty

11 3 2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date  This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority but you will be liable for the Condemnation Payments set forth in Section 12 2

11 3 3   The protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty

## 11 4    Our Other Remedies.   We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, including the failure to observe Technology Standards, discontinue

16

cuSign Envelope ID 02885DC9-8C55-4___-3BFD-7063E11CFE68

reservation referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default All System Assessment Fees accrue during the suspension period Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Reconnection Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards We may omit the Facility from any paper or electronic directory of Chain Facilities that we issue We may also suspend or terminate any temporary or other fee reductions we may have agreed to in this Agreement and/or any stipulations in Section 18 below, and/or cease to provide any operational support until you address any failure to perform under this Agreement You agree that our exercise of any rights in this Section will not constitute an actual or constructive termination of this Agreement All such remedies are cumulative and not in lieu of any other rights or remedies we may have under this Agreement If we exercise our right not to terminate this Agreement but to implement such suspension and/or removal, we reserve the right at any time after the appropriate cure period under the written notice has lapsed, to, upon written notice to you, terminate this Agreement without giving you any additional corrective or cure period (subject to applicable law) If you default under this Agreement because the Facility fails to meet System Standards, including without limitation failing a quality assurance inspection, we may, at our option and in our sole discretion, require as a condition to your cure of the default that you engage a hotel management company acceptable to us to operate the Facility for a period of at least two years, or longer in our discretion You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief, without the need for posting any bond We may litigate to collect amounts past due under this Agreement without first issuing a default or termination notice Our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults Once a termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may cease accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date including or following the termination or expiration of this Agreement

## 11 5    Your Remedies.

11 5 1   If we do not issue our approval or consent as and when required under this Agreement, within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation    To the extent permitted by applicable law, this action to compel us to issue our approval or consent shall be your exclusive remedy

11 5 2   You (and your owners and guarantors) waive, to the fullest extent permitted by law, any right to, or claim for, any punitive or exemplary damages against us and against any affiliates, owners, employees or agents of us, and agree that in the event of a dispute, you will be limited to the recovery of any actual damages sustained and any equitable relief to which you might be entitled

17

## 12. Liquidated Damages.

12 1    **Generally.**  If we terminate the Franchise under Section 11 2, or you terminate this Agreement (except under Section 11 3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination  If Termination occurs during the last two Franchise Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18 2, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7 1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination  You will also pay any applicable Taxes assessed on such payment  Before the last two Franchise Years, Liquidated Damages will be **as set forth in Section 18.2.**  If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date  Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement  Our right to receive other amounts due under this Agreement is not affected

12 2    **Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year (the  Notice Period  ) after we receive the initial notice of condemnation described in Section 11 3, or until the Condemnation occurs, whichever is longer  You will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the Notice Period if the Condemnation is completed before the Notice Period expires  This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority)  You will pay no Liquidated Damages if the Condemnation is completed after the Notice Period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed

## 13. Your Duties At and After Termination.  When a Termination occurs for any reason whatsoever

13 1    **System Usage Ceases.**  You must comply with the following  de-identification obligations  You will immediately stop using the System to operate and identify the Facility  You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual or other brand directives for changing the identification of the Facility  You will promptly paint over or remove the Facility's distinctive System trade dress  color schemes and architectural features  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces  You will cease all Internet marketing using any Marks to identify the Facility  If you do not strictly comply with all of the de-identification requirements above, in the System Standards Manual and in our other brand directives, you agree to pay us a royalty equal to $2,000 per day until de-identification is completed to our satisfaction

18

13 2    **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11 4  We may notify third parties that the Facility is no longer associated with the Chain  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual  Confidential Information, equipment and all other personal property of ours  If you have not completed your de-identification obligations to our satisfaction, we may paint over or remove and purchase for $10 00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility that you have not removed or obliterated within five days after termination  You will promptly pay or reimburse us for our cost of removing such items, net of the $10 00 purchase price for signage  We will exercise reasonable care in removing or painting over signage  We will have no obligation or liability to restore the Facility to its condition prior to removing the signage  We shall have the right but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value with the right to set off their aggregate purchase price against any sums then owed us by you  You will transfer to us any domain names you own that include any material portion of the Marks

13 3    **Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions  You acknowledge and agree that once a termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may stop accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date on or after the termination or expiration of this Agreement  In addition, when this Agreement terminates or expires for any reason, we have the right to contact those individuals or entities who have reserved rooms with you through the CRS to inform them that your lodging facility is no longer part of the System  We further have the right to inform those guests of other facilities within the System that are near your Facility in the event that the guests prefer to change their reservations  You agree that the exercise of our rights under this Section will not constitute an interference with your contractual or business relationship

13 4    **Survival of Certain Provisions.**  Sections 3 6 (as to audits, for 2 years after termination), the first two sentences of 3 11, 7 (as to amounts accruing through termination), 8, 11 3 2, 11 4  12 13, 15, 16 and 17 survive termination of this Agreement  Additionally, all covenants, obligations and agreements of yours which by their terms or by implication are to be performed after the termination or expiration of the Term, shall survive such termination or expiration

**14. Your Representations and Warranties.**  The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement  You expressly represent and warrant to us as follows

14 1    **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement, or lease, the Location and the Facility  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your

19

performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility   You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement

14 2   **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement   You have obtained all necessary approvals of your Owners, Board of Directors and lenders   No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement   Schedule B accurately reflects your ownership   Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your Owners is a party or is subject or to which the Facility is subject   Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application   You will submit to us the documents about the Facility, you, your Owners and your finances that we request in the Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement   You represent and warrant to us that the information you provided in your Application is true, correct and accurate   To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or are, a terrorist, a  Specially Designated National  or a  Blocked Person  under U S  Executive Order 13224  in lists published by the U S  Department of Treasury s Office of Foreign Assets Control  or otherwise

14 3   **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your Owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement

## 15. Proprietary Rights.

15 1   **Marks and System**   You will not acquire any interest in or right to use the System or Marks except under this Agreement   You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing  You agree to (i) execute any documents we request to obtain or maintain protection for the Marks, (ii) use the Marks only in connection with the operation of the Facility as permitted by the System Standards, and (iii) that your unauthorized use of the Marks shall constitute both an infringement of our rights and a material breach of your obligations under this Agreement

20

15 2   **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will shall be our property and will inure to our benefit  You acknowledge that System Standards include non-functional trade dress that is an integral part of the System and you covenant that you will not, directly or indirectly through an affiliate, use the trade dress in any structure that is not a Chain Facility  No good will shall attach to any secondary designator that you use

15 3   **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee) provide services to or joint venture (i) distinctive separate lodging, or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging  food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory   You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists  franchise sales personnel (or independent franchise sales representatives), etc

15 4   **Confidential Information.**   You will take all appropriate actions to preserve the confidentiality of all Confidential Information   Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement   You will not permit copying of Confidential Information (including, as to computer software, any translation  decompiling, decoding, modification or other alteration of the source code of such software)   You will use Confidential Information only for the Facility and to perform under this Agreement   Upon termination (or earlier  as we may request) you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information  "fixed in any tangible medium of expression   within the meaning of the U S  Copyright Act, as amended   Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years   We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information

15 5   **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware   We alone will handle disputes with third parties concerning use of all or any part of the System   You will cooperate with our efforts to resolve these

21

disputes  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material

15 6    **The Internet and other Distribution Channels**  You may use the Internet to market the Facility subject to this Agreement and System Standards  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent  You will assign to us any such identification at our request without compensation or consideration  You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent  You must make available through the Reservation System and the Chain Website all rates you offer directly to the general public or indirectly via Internet marketing arrangements with third parties  You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs  You must participate in the Chain's best available rate on the Internet guarantee or successor program  The content you provide us or use yourself for any Internet or distribution marketing materials must be true, correct and accurate  and you will notify us in writing promptly when any correction to the content becomes necessary  You shall promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15 2

## 16. Relationship of Parties.

16 1    **Independence.**  You are an independent contractor  You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever  We and you have a business relationship based entirely on and circumscribed by this Agreement  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement  You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations  employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees

16 2    **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly  The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities

## 17. Legal Matters.

17 1    **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect  If all or any part of a provision of this Agreement is declared invalid or unenforceable  for any reason, or is not given

22

effect by reason of the prior sentence, the remainder of the Agreement shall not be affected However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party

17 2   **Waivers, Modifications and Approvals.**   If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice   Our silence or inaction will not be or establish a waiver   consent, course of dealing, implied modification or estoppel   All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective   We may unilaterally revise Schedule C when this Agreement so permits

17 3   **Notices.**   Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, (iii) by first class, prepaid certified or registered mail, return receipt requested, (iv) by electronic mail, posting of the notice on our Chain intranet site or by a similar technology or (v) by such other means as to result in actual or constructive receipt by the person or office holder designated below, to the appropriate party at its address stated below or as it may otherwise designated by notice   You consent to receive electronic mail from us Notices shall be deemed given on the date delivered or date of attempted delivery, if refused

BAYMONT FRANCHISE SYSTEMS, INC
Our address   22 Sylvan Way, Parsippany, New Jersey 07054-0278
Attention  Senior Vice President - Contracts Administration, Fax No   (973) 753-7254

Your name  Tanzam LLC
Your address  42309 S Morrison Blvd  Hammond, LA 70403
Attention  Kirit Patel, Your fax No   _____, Your e-mail address _____

17 4   **Remedies.**   Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity   The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement

17 5   **Miscellaneous.**   This Agreement is exclusively for the benefit of the parties   There are no third party beneficiaries   No agreement between us and anyone else is for your benefit   The section headings in this Agreement are for convenience of reference only

17 6   **Choice of Law; Venue; Dispute Resolution.**

17 6 1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles   The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey

17 6 2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties  relationship promptly through negotiation between authorized representatives   If these

23

efforts are not successful either party may attempt to resolve the dispute through non-binding mediation   Either party may request mediation through the National Franchise Mediation Program using the procedures employed by the CPR Institute for Dispute Resolution Inc   We will provide you with the contact address for that organization   The mediation will be conducted by a mutually acceptable and neutral third party   If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation

17 6 3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you

**17 6 4  WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17 6 5  Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action   You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action

**17 7    Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17 7 1  You have read our disclosure document for prospective franchisees ("FDD") and independently evaluated and investigated the risks of investing in the hotel industry generally and purchasing this franchise specifically, including such factors as current and potential market conditions, owning a franchise and various competitive factors**

**17 7 2  You have received our FDD at least 14 days before signing this Agreement or paying any fee to us**

**17 7 3  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

**17 7 4  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise other than the representations set forth in the FDD.**

**17 7 5  You acknowledge that no salesperson has made any promise or provided any information to you about actual or projected sales, revenues, income, profits or expenses**

24

from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement and signed by us.

17 7 6 **You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17 8    **Force Majeure** Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from  (a) windstorms rains, floods, earthquakes, typhoons mudslides or other similar natural causes, (b) fires, strikes embargoes war, acts of terrorism or riot  (c) legal restrictions that prohibit or prevent performance, or (d) any other similar event or cause beyond the control of the party affected  Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments

17 9    **No Right to Offset**  You acknowledge and agree that you will not withhold or offset any liquidated or unliquidated amounts  damages or other monies allegedly due you by us against any Recurring Fees or any other fees due us under this Agreement

18    **Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms  length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties  These are personal to you and are not transferable or assignable except to a Permitted Transferee

18 1    **Combined Fees**  Notwithstanding Section 7 1, you will pay a Combined Fee consisting of the Royalty and System Assessment Fee (which is comprised of a Marketing Contribution and Basic Reservation Fee) at the rates set forth in this Section   The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement

18 1 1  The Combined Fee shall be six and one-half percent (6 5 %) of Gross Room Revenues accruing during the first and second Franchise Years, and

18 1 2  The Combined Fee shall be seven and one-half percent (7 5 %) of Gross Room Revenues accruing during the third Franchise Year, and

18 1 3  The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7 1 on Gross Room Revenues accruing after the third Franchise Year

25

18 1 4    The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any in the notice of default, or (ii) after you either satisfy the Improvement Obligation or fail to complete it by the required deadlines, the Facility receives a quality assurance inspection score of less than 80% (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of more than 80% in a re-inspection to be performed not less than 60 days after the initial inspection

18 2 **Liquidated Damages**   Liquidated Damages payable under Section 12 1 for a Termination that occurs before the last two Franchise Years will be $1,000 00 for each guest room of the Facility you are authorized to operate pursuant to Schedule B of this Agreement, prior to any room count reductions

18 3 **Your Additional Termination Right.** You may terminate this Agreement without cause or penalty effective only on the fifth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination   You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination   Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted if any, in the notice of default we send you or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 80% (or its then equivalent) on a quality assurance inspection and then fails to achieve a score more than 80% (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection   You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent

18 4 **Our Additional Termination Right.** We may terminate this Agreement without cause or penalty effective only on the fifth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination   You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination   You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination   We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent

**[SIGNATURES FOLLOW ON NEXT PAGE]**

26

icuSign Envelope ID 02885DC9 8C55-     BBFD-7063E11CFE68

IN WITNESS WHEREOF, the parties have executed this Agreement on this 8___ day of
February_____, 20 18___ and agree to be bound by the terms and conditions of this
Agreement as of the Effective Date stated above

**WE:**
**BAYMONT FRANCHISE SYSTEMS, INC.**

By _____

Michael Piccola
Senior Vice President


**YOU, as franchisee**
**TANZAM LLC**

By _____

**Kirit Patel**
**Manager**

27

## APPENDIX A

### DEFINITIONS

<u>ADA</u> means the Americans with Disabilities Act, as amended, 42 U S C 12101 et seq , and the related Federal regulations, as amended, including the Accessibility Guidelines and Standards for Accessible Design 28 C F R Part 36, Appendix A

<u>Additional Fees</u> means the fees charged under Section 7 1 2 other than the System Assessment Fee

<u>Agreement</u> means this Franchise Agreement

<u>Application Fee</u> means the fee you pay when you submit your Application under Part 6

<u>Approved Plans</u> means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D

<u>Approved Supplier</u> means a vendor authorized by us to provide proprietary or Mark-bearing items, or whose goods and services are deemed to meet applicable System Standards

<u>Casualty</u> means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control

<u>Chain</u> means the network of Chain Facilities

<u>Chain Facility</u> means a transient lodging facility we own, lease, manage operate or authorize another party to operate using the System and identified by the Marks

<u>Chain Websites</u> means any current or future consumer or business websites, mobile websites or mobile applications that we or our affiliates develop for booking reservations for and/or providing information about Chain Facilities, and any future equivalent technology

<u>Condemnation</u> means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation

<u>Conference Fee</u> means the fee we charge for your attendance at a conference for Chain Facilities and then franchisees when and if held

<u>Confidential Information</u> means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence   Confidential Information includes all other system standards manuals and documentation, including those on the subjects of employee relations, finance and administration,

Appendix A - 28

field operation, purchasing and marketing, the property management system software and other applications software

<u>Design Standards</u> mean standards specified in the System Standards Manual from time to time for design construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking systems, landscaping, amenities interior design and decor and the like for a Chain Facility

<u>Directory</u> means any general purpose directory we issue, whether printed web-based or issued in another medium, which may list the names and addresses of Chain Facilities in the United States, and at our discretion, other System facilities located outside the United States, Canada and Mexico

<u>Effective Date</u> is the date we insert in the Preamble of this Agreement after we sign it

<u>Equity Interests</u> shall include, without limitation, all forms of equity ownership of you, including voting stock interests partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests

<u>Equity Transfer</u> means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those Owners disclosed on Schedule B, as in effect prior to the transaction   Unless there are contractual modifications to your owners rights an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner   An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date   An Equity Transfer does <u>not</u> occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners An Equity Transfer occurs when you merge consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners combined Equity Interests in the surviving entity to less than a majority

<u>Facility</u> means the Location, together with all improvements, buildings, common areas structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date

<u>FF&E</u> means furniture, fixtures and equipment

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility

Appendix A - 29

Food and Beverage means any restaurant, catering bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast food or beverage concessions and similar services offered at the Facility

Franchise means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location using the System and the Mark we designate in Section 1

Franchise Year means

(i) If the Opening Date occurs on the first day of a month the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date and each subsequent one year period. or

(ii) If the Opening Date does not occur on the first day of a month the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period

Gross Room Revenues is defined as gross revenues attributable to or payable for rentals of guest (sleeping) rooms at the Facility, including all credit transactions whether or not collected, guaranteed no-show revenue, net of chargebacks from credit card issuers, any proceeds from any business interruption or similar insurance applicable to the loss of revenues due to the non-availability of guest rooms and any miscellaneous fees charged to all guests regardless of the accounting treatment of such fees  Excluded from Gross Room Revenues are separate charges to guests for Food and Beverage (including room service), actual telephone charges for calls made from a guest room  key forfeitures and entertainment (including Internet fees and commissions), vending machine receipts, and federal, state and local sales, occupancy and use taxes

Guest Information means any names, email addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility including without limitation stay information, that either you or we or a person acting on behalf of you, us, or both you and us, receives from or on behalf of the other or any guest or customer of the Facility or any other third party

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6, if the Agreement is for a new construction or conversion franchise

ocuSign Envelope ID 02885DC9 8C55       BBFD-7063E11CFE68

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty

Location means the parcel of land situated at 42309 S Morrison Blvd, Hammond, LA 70403, as more fully described in Schedule A

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnities including guest refunds, or (ii) incurred by any and all Indemnities to investigate, respond to or defend a matter, including without limitation investigation and trial charges costs and expenses attorneys' fees experts fees court costs settlement amounts, judgments and costs of collection and (y) the Returned Check Fee we then specify in the System Standards Manual ($20 00 on the Effective Date) if the drawee dishonors any check that you submit to us

Loyalty Program Charge means the fee you pay us under Section 7 1 3 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the names, designs and logos for BAYMONT  U S  Reg No  2,258,085   BAYMONT   INN , U S  Reg  No 2 286 567, BAYMONT INN & Design U S  Reg Nos  2 307 473, 2 354,792  2 383,033   BAYMONT INN & SUITES  U S  Reg No  2 713,336, BAYMONT INN & SUITES & Design, U S  Reg Nos 2,399,770, 2 354,791, 2,309,146, and other marks, and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests

Marketing Fees means the System Assessment Fee and the Additional Fees charged under Section 7 1 2 and Schedule C, and the Loyalty Program Charge, if any

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere

Material Renovation means the upgrading, updating, modifications, replacements, additions, repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3 14

Material Renovation Notice means the written notice from us to you specifying the Material Renovation to be performed and the dates for commencement and completion given under Section 3 14

BAY CONVERSION
Q2/17

Opening Date has the meaning specified in Schedule D

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations

Owners means the persons identified on Schedule B as the owners of your Equity Interests

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an Owner any or all of the Owner's Equity Interests upon the death of the Owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor

Prototype Plans has the meaning specified in Schedule D for New Construction Facilities

Punch List means any list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3 1 and Schedule D

Reconnection Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement or for any other reason, in the amount specified in Schedule C

Recurring Fees means the Royalties and Marketing Fees as stated in Section 7

Relicense Fee means the fee your transferee pays to us when a Transfer occurs or the fee you pay to us if you are renewing an existing franchise

Reinspection Fee means the fee you must pay to us under Section 3 7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards

Reservation System or Central Reservation System means back end technology platform and applications used by us to accept, store and/or communicate reservations for Chain Facilities The Reservation System is separate from, but enables, the booking of reservations for Chain Facilities through various distribution channels such as the Chain Websites, the GDS and other distribution channels

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility

Royalty means the monthly fee you pay to us for use of the System under Section 7 1 "Royalties" means the aggregate of all amounts owed as a Royalty

Appendix A - 32

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify, which at present includes only the following (a) the Marks, (b) other intellectual property, including Confidential Information, System Standards Manual and know-how, (c) marketing, advertising, publicity and other promotional materials and programs, (d) System Standards, (e) training programs and materials, (f) quality assurance inspection and scoring programs, and (g) the Reservation System

System Assessment Fees means the fees charged under Section 7 1 2 and Schedule C for the Chain s marketing advertising, public relations, Reservation System, training and other services

System Standards means the standards for participating in the Chain and using the System published in the System Standards Manual, or elsewhere, including but not limited to design standards, FF&E Standards, Marks standards, marketing standards, operations standards, technology standards and maintenance standards and any other standards, policies, rules and procedures we promulgate about System operation and usage

System Standards Manual means the Standards of Operation Manual and any other manual or written directive or other communication we issue or distribute specifying the System Standards

Taxes means the amounts payable under Section 7 2 of this Agreement

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, Internet access, in-room and public area technology, point of sale terminals and computer hardware and software for various applications, including but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5

Termination means a termination of this Agreement

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) you lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction

You' and Your' means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees

Appendix A - 33

ocuSign Envelope ID 02885DC9-8C55 4    3BFD-7063E11CFE68

"We   Our  and  Us   means and refers to Baymont Franchise Systems, Inc  a Delaware corporation, its successors and assigns

cuSign Envelope ID 02885DC9-8C55-4    3BFD-7063E11CFE68

## SCHEDULE A

(Legal Description of Facility)

BAY CONVERSION
Q2 17

## SCHEDULE B

### *PART I   YOUR OWNERS*

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| **Kirit Patel** | **33 1/3%** | **member** | |
| **Girish Patel** | **33 1/3%** | **member** | |
| **Archna Patel** | **33 1/3%** | **member** | |

### *PART II   THE BAYMONT FACILITY*

Number of approved guest rooms **59**

[Number of approved suites        ]

Initial

# BAYMONT FRANCHISE SYSTEMS, INC.
## SCHEDULE C
### April 2017

**I.     System Assessment Fees**

The System Assessment Fees consist of the Marketing Contribution" and the Basic Reservation Fee    The Marketing Contribution is 2 0% of Gross Room Revenues, the Basic Reservation Fee is 1 5% of Gross Room Revenues   We reserve the right, in our sole discretion, to increase or modify the System Assessment Fees for all Chain Facilities from time to time to cover costs (including reasonable direct or indirect overhead costs) related to the services and programs referenced in 7 1 2 but only after consultation with the official advisory board or committee, if any, and upon 30 days prior written notice

**II     Additional Fees**

**A     Loyalty Program Fees**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program    The Loyalty Program Charge is 5% of the Gross Room Revenues accruing from each  Qualified Stay" at the Facility as defined in the Front Desk Guide or any other program rules, which are System Standards   We will proactively match and award members with points or other program currency they earn on Qualified Stays even if they do not present their Wyndham Rewards membership card upon check-in  You will be billed monthly in arrears for points or other program currency awarded to members during the preceding month  If you do not achieve a certain number of Wyndham Rewards valid enrollments every month, you must pay us a Retaining Fee as described in the Front Desk Guide  Currently, the Retaining Fee is $250  If you do not process a member's points in a timely manner and we must resolve the issue with the member, we will charge you a Loyalty Member Services Administration Fee as described in the Front Desk Guide

**B     Customer Care Fee**

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest   We may also contact you, at our discretion, if we become aware of any other complaints about the Facility including complaints which are posted on third-party travel websites, distribution channels, blogs and social networks, or other forums to which you do not respond   If you do not respond to resolve any complaint to the satisfaction of the guest within three business days after we refer it to you  we will charge you a "Customer Care Fee  of up to $195 00  plus the costs we incur to settle the matter with the guest   The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages   All guest complaints remain subject to indemnification under this Agreement

## C     Best Rate Guarantee Program

You must (i) make available through the Central Reservation System and the Chain Websites room rates equivalent to those you offer to the general public directly or indirectly via third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Rate Guarantee Program according to its published requirements  We will also charge you a Processing Fee, currently $60 to reimburse us for our administrative charges of handling the complaint

## D     Reconnection Fee

If we suspend Central Reservation System service because of your default under this Agreement or for any other reason, then you must pay us the Reconnection Fee set forth in the System Standards before we restore service  Currently, the Reconnection Fee is $4,000

## E     Other Fees, Commissions and Charges

You will pay us a fee, as applicable, for reservations for your Facility from certain distribution partners processed through various reservation channels   GDS Fees" are assessed for qualified reservations processed through any global distribution system ( GDS ) or through any Internet website or other booking source powered by a GDS   Internet Booking Fees" are assessed for qualified reservations processed through an Internet website connected through an alternate distribution system   Third Party Channel Fees" are assessed for qualified reservations coming from our partners directly or indirectly to our distribution platform  We will establish the amount of the GDS, Internet Booking Fees, and Third Party Channel Fees from time to time based on the fees these channels charge us and/or our own costs (including overhead) for providing these services   Some of our distribution partners may charge a commission on reservations you receive through these reservation channels and, if we pay such commission on your behalf, you will reimburse us and pay our service charge of 1 5% of commissionable revenue  Upon written notice to you, we may alter, change, modify, remove or add new fees as existing reservation channels are modified or partners are added to existing channels or new reservation channels are established

You will also pay commissions for (a) reservations booked by "Agents  and/or (b) qualified reservations consumed by members of affinity groups and organizations that participate in our Member Benefits program  You must pay our service charge of 1 5% of commissionable revenue  if applicable   Agents  include, but are not limited to  travel agents  on-line travel and referral websites, travel consortia, travel management companies  and global sales agents, as well as digital media linking to Chain websites and unique call center numbers purchased by the pay-for-performance program ("PFP")  These commission payments may go to the Agent, affinity group or organization in whole or a portion of the payment may be allocated to various marketing activities and/or to our Global Sales Organization to offset its administrative and overhead costs for supporting the Member Benefit Program and other programs that generate room nights at Chain Facilities, or, in the case of the PFP program, to fund purchases of additional digital media directing consumers to Chain websites and unique call center numbers

BAY CONVERSION
Q2-17

cuSign Envelope ID 02885DC9 8C55-4     3BFD 7063E11CFE68

Under our Wyndham Referral Rewards Program, Chain Facilities may receive leads from other Chain Facilities, facilities of our affiliates and employees of Wyndham Worldwide Corporation ("WWC") For this business, we or an affiliate charge you a sales commission of 10% of the Gross Room Revenues on qualifying reservations referred to you by another Chain Facility, a facility of an affiliate or an employee of WWC We or our affiliate pays 7% of the sales commission when the referring party is a Chain Facility or facility of an affiliate and 6% of the sales commission when the referring party is an employee of WWC The remaining 3% and 4%, as applicable, is distributed to our Global Sales Organization to offset its administrative and overhead costs for supporting the Wyndham Referral Rewards Program

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services, programs and distribution channels at any time upon not less than thirty (30) days written notice

BAY CONVERSION
Q2/17

ocuSign Envelope ID 02885DC9 8C55   BBFD 7063E11CFE68

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

This Addendum applies if you are converting an existing guest lodging facility to a Chain Facility

## 1.  YOUR IMPROVEMENT OBLIGATION.

**1.1 Generally.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with this Agreement and System Standards   You must provide us with proof that you own or lease the Facility by the earlier to occur of (a) 30 days after the Effective Date or (b) the Opening Date   You must maintain control of the Facility consistent with such documentation during the Term   You must begin renovation of the Facility no later than 30 days after the Effective Date   Time is of the essence for the completion of the Improvement Obligation   We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation   The grant of an extension will not waive any other default existing at the time the extension is granted   All renovations must comply with System Standards, any Approved Plans, this Agreement and the Punch List   Your general contractor or you must carry the insurance required under this Agreement during renovation

**1.2 Pre-Opening Improvements.** You must complete all renovations specified as  prior to opening  on the Punch List before we consider the Facility to be ready to open under the System  The deadline for completing the pre-opening phase of conversion and the renovations shall be as specified on any Punch List attached to this Agreement, but is otherwise 90 days from the Effective Date   You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires   We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening improvements of the Facility by the dates specified on the Punch List or otherwise and you fail to do so within five days after we send you written notice of default, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System in violation of this Schedule and you fail to cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default   You will pay us a non-refundable extension fee of $2 00 per room per day of any extension of the deadline for completing pre-opening improvements   This fee will be payable to us after each 30 days of the extension   You will pay us the balance of any outstanding extension fee within 10 days after the Opening Date   You must also pay us the Reinspection Fee described in Section 3 7 if you fail to complete the Improvement Obligation by the deadline established in the Punch List or otherwise and our representatives must return to the Facility to inspect it   In limited circumstances, you may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval   If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Section 11, you will begin paying the Royalty to us, as specified in Section 7 1, from the date you identify or operate the Facility using the Mark   We may delay the Opening Date until you pay the Royalty accruing under this Section

BAY CONVERSION
Q2/17

ocuSign Envelope ID 0288SDC9 8C55-4    3BFD-7063E11CFE68

### 1.3 Improvement Plans.

(a) Prototype Plans Renovation  If the Punch List requires you to renovate the Facility in accordance with our Prototype Plans (or you elect to receive the Prototype Plans), you will be required to electronically designate an architect who must electronically accept the Prototype Plans Agreement  Within 15 days after we electronically receive the signed Prototype Plans Agreement, we will deliver to your architect a complete set of our Prototype Plans  Your architect and you will create construction documents (including a project manual and working drawings) for renovation of the Facility based upon the Prototype Plans, System Standards and this Agreement so that it conforms as closely as possible to the Prototype Plans and System Standards, and then submit them for our approval before starting demolition and improvement of the Location

(b) Generally  You will create plans and specifications for the work described in Section 1 1 of this Schedule D (based upon System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like, who must exercise their own independent professional care, skill and diligence in the design and renovation of your Facility  Our review does not cover technical, architectural or engineering factors relating to the existing structure at the Location, the validity of conversion given the existing structure, or compliance with federal, state or local laws, regulations or code requirements, for which your architect is responsible  You must allow for 10 days of our review each time you submit Plans to us  We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after the renovation  Any material variation from the Approved Plans requires our prior written approval  Approved Plans must incorporate design elements as set forth in System Standards  You may purchase furniture, fixtures, equipment and other supplies that you may need during renovation of the Facility through our affiliate, Worldwide Sourcing Solutions, Inc s  Approved Supplier´ program  If you choose to purchase certain design items from a supplier other than an Approved Supplier, we may charge you a Custom Interior Design Review Fee, currently $5,000  This fee will be assessed for our review of custom interior design drawings which you must submit to us to ensure compliance with our interior design standards      We may offer other optional architectural and design services for a separate fee  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request

(c) Deviation from Approved Plans  We may inspect the work while in progress without prior notice  We may direct you to change the work in progress if it deviates from the Approved Plans or System Standards and may terminate this Agreement if you fail to comply with any such direction  If you encounter unexpected issues with demolition, renovation, reconstruction or refurbishment of the existing structure which make continuation of the project using the Approved Plans commercially infeasible, you must notify us immediately and provide a complete written report on the matter, including any proposal to modify the Approved Plans you believe is appropriate together with your estimate of the projected costs of meeting the Approved Plans  We will evaluate the report, your proposal and the situation and respond within 30 days to

any request to vary the Approved Plans, or provide suggestions for resolving the issues in such a manner as will be acceptable to us  Neither party shall terminate this Agreement unless and until such notice is given and the 30 day period shall have elapsed without agreement on modifying the Approved Plans  If either party then decides to terminate this Agreement, you will pay, if then not paid, and we will retain, the full Initial Fee as Liquidated Damages

## 2.  INTEGRATION SERVICES.

**2.1 Integration Services**   In addition to the above, we will provide the following  Integration Services  to assist you in opening the Facility  We will provide training through various on-line courses on subjects such as quality assurance, Wyndham Hotel Group Resources, housekeeping, preventative maintenance, customer service, and the RFP process  A member of our field team will also assist with property operations topics including Systems Standards, use of the Chain's intranet site and revenue management concepts  We will deliver to you initial property supplies, as determined by us in our reasonable discretion  of certain Mark-bearing guest room products  We will arrange to have digital photographs taken of the Facility in accordance with System Standards which will be suitable for posting on our Chain Websites, third party travel websites and various marketing media and will be owned by us  If we allow you to open the Facility before your installation of permanent signage, we will arrange for one of our Approved Suppliers to provide temporary exterior signage for the Facility in the form of a Mark-bearing bag to cover any existing primary free standing sign  If you install permanent signage from an Approved Supplier for the Facility on or before the Opening Date, or if within thirty (30) days of the Opening Date, you sign a quote and pay the required deposit for permanent signage from the vendor assigned to provide temporary signage for the Facility, we shall issue you a credit of $1,000 against the Integration Fee  We will provide training for your general manager as set forth in Section 4 1 of the Agreement if he/she attends the training by the deadline set forth in Section 4 1   As part of Integration Services, our on-boarding team will implement certain Facility-specific marketing initiatives designed to help create awareness of the Facility in the market

**2.2 Integration Fee**   You will pay a non-refundable "Integration Fee" of $8,400 on or before the Opening Date

## 3.  DEFINITIONS.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System

Prototype Plans means the prototype documents reflecting the overall design intent  FF&E  and color schemes for a Chain Facility that we deliver to you after the Effective Date

Prototype Plans Agreement means the agreement that your designated architect will execute in order to receive a copy of the Prototype Plans

Schedule D Conversion - 42

# SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

**[Punch List Attached]**

## ' **GUARANTY**

To induce Baymont Franchise Systems, Inc its successors and assigns ( you ) to sign the Franchise Agreement (the Agreement ) with the party named as the 'Franchisee to which this Guaranty is attached, the undersigned jointly and severally ( we our or 'us ) irrevocably and unconditionally (i) warrant to you that Franchisee s representations and warranties in the Agreement are true and correct as stated and (ii) guaranty that Franchisee's obligations under the Agreement including any amendments will be punctually paid and performed

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee We waive notice of amendment of the Agreement We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution and WAIVER OF JURY TRIAL, applies to this Guaranty

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement

**GUARANTORS**

_DocuSigned by_
_Kint Patel_
———————————————————
428J6E3A0021482
Name  Kint Patel
Address  42309 S Morrison Blvd, Hammond, LA 70403

_DocuSigned by_
_Girsh Patel_
———————————————————
B3AE5DCE19C44EB
Name  Girish Patel
Address  42309 S Morrison Blvd, Hammond, LA 70403

_DocuSigned by_
_Archna Patel_
———————————————————
CC0AA2BEB0D945C
Name  Archna Patel
Address  42309 S Morrison Blvd, Hammond, LA 70403

Guaranty-43

uSign Envelope ID 02885DC9 8C55 4    BFD-7063E11CFE68



# Baymont Franchise Systems, Inc.

## PROPERTY IMPROVEMENT PLAN REPORT

---

### Hammond Budget Inn
### Hammond, LA

### Conversion To
### Baymont

## Inspection Date: January 23, 2018

cuSign Envelope ID  02885DC9-8C55      BBFD 7063E11CFE68

## PLAN REQUIREMENTS & SUBMITTAL PROCESS

Please submit all design plans and specifications to the Global Design Department (interior design@wyn com) for review and approval prior to purchasing or starting renovations  All renovations must meet Brand Standards, any items purchased or renovated without approval may need replacement if they do not meet brand design standards

## OVERVIEW

The PIP identifies specific items which we inspected at the Facility which were not in compliance with brand standards and need to be corrected It is the responsibility of the Owner/Franchisee to review the Brand Standards Manual for a complete description of all standards and to maintain Brand Standards for any areas of the property that are not specifically covered in this PIP

In addition, you are responsible for ensuring that the Facility is constructed, improved, maintained and operated in compliance with all applicable federal, state and local laws, codes, ordinances and regulations, including but not limited to, the Americans with Disabilities Act and its Accessibility Guidelines  This PIP was based on a random sample inspection of the Facility on the date specified  You may need to take additional actions to meet brand standards or comply with law or, at our discretion, if the condition of the facility changes materially since the inspection date or if the brand standards change

All items in this PIP are required to be completed no later than the timeframes noted  Time extensions in no way imply a waiver  Failure to comply with specified deadlines for completing items may result in default under your license or franchise agreement and reservation service suspension  All items will continue to be evaluated on condition, appearance and adherence to brand standards through periodic quality assurance inspections  Any items on a future quality assurance inspection that do not meet brand standards will be required to be remedied Failure to maintain acceptable levels of conditions and appearance and adherence to brand standards may be grounds for default under the Franchise or License Agreement

Prior to the commencement of all work you are required to ensure that you are complying with the most current standards  Please consult your Development Director or noted department with specific questions to comply with the requirements contained in the PIP

*To obtain access to the Brand Standards please visit https //whgstandards.Iraqa com/ and submit an account application  Your request will be reviewed and processed in a timely manner*

By signing this PIP, you acknowledge and agree that this PIP may be provided to Wyndham Hotel Group's approved vendors for the purpose of their offering products and services that are required to complete this PIP  You hereby grant permission for the entire PIP and/or any information necessary for the vendor to offer their products and services  The information provided includes but is not limited to contact information, property address, number of rooms  brand converting to, and a list of items related to necessary or required products and services

ONLY THE FRANCHISOR MAY REVISE THIS PIP  THE PIP IS VOID 180 DAYS AFTER THE INSPECTION DATE UNLESS THE FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE

The Franchise Review Committee may in its discretion revise this PIP as a condition of approving your application  You should not consider this PIP to be final until we sign the License or Franchise Agreement

Signed _____   Date _____  1/30/2018

*DocuSigned by*
*kirit Patel*
42838E3A0021482

Print Name _____ Kirit Patel _____

Revisions- All Previous Copies are Invalid

Sign Envelope ID  02885DC9 8C55-41AD BBFD 7063E11CFE68

## apital Improvement Plan

### o Be Completed Prior To Opening

| Category | Sub Category | Item Description | Required Action Description | Design/ Brand Approval Required |
|---|---|---|---|---|
| ministrative icies | Additional Item | Additional Inspection Item | Maintenance  The property must be well maintained  This requirement pertains to all areas of the property  including  but not limited to  guestrooms public areas  grounds  curb appeal  building  equipment  decor  furniture fixtures and equipment  vehicles  signs  linens and supplies  A general maintenance program must be in place to ensure that all facilities are functional having addressed all conditional deficiencies | |
| ministrative icies | Additional Item | Additional Inspection Item | Cleanliness  The property must be clean and neat in appearance  This requirement pertains to all areas of the property  including  but not limited to guestrooms  public areas  grounds  curb appeal  building  equipment  decor furniture  fixtures and equipment  vehicles  signs  linens and supplies  Properties not meeting cleanliness standards may be required to complete housekeeping training | |
| ministrative icies | Additional Item | Additional Inspection Item | Brand Standards  This property improvement plan identifies specific items which do not currently meet brand standards  The property must also comply with all standards as outlined in the Brand Standards Manual  This requirement pertains to all areas of the property  including  but not limited to guestrooms  public areas  grounds  curb appeal  building  equipment  decor furniture  fixtures and equipment  vehicles  signs  linens and supplies | |
| ministrative icies | Additional Item | Additional Inspection Item | Any PIP item that requires brand/design approval must comply with the brand design guidelines and per the time frames noted in this PIP report | |
| ministrative icies | Hotel Technology | Can you access high speed Internet at the property and does the minimum bandwidth into your hotel meet Brand Standards? | Provide complimentary high speed Internet access in all guestrooms and interior public areas from an approved vendor  ensuring all Brand Standard requirements are met including a Terms and Conditions page  Brand splash page, In Room instructions  and Guest support as required | |
| ministrative icies | Hotel Technology | Telephone System | Provide a telephone system as required | |
| ministrative icies | Hotel Technology | Property Management System | Provide a Property Management System as required | |
| od & Beverage | Breakfast / Hospitality Room | Hours of Operation | Provide a Continental breakfast as required | |
| od & Beverage | Breakfast / Hospitality Room | Finishes  Doors/Ceiling/Walls/Window Treatment | Construct a breakfast area | Yes |
| od & Beverage | Breakfast / Hospitality Room | Furniture -Tables/Chairs | Provide breakfast area seating package (chairs and tables) | Yes |
| od & Beverage | Breakfast / Hospitality Room | Furniture  Counters/Cabinetry | Provide professionally crafted cabinetry/countertops | Yes |
| od & Beverage | Breakfast / Hospitality Room | Television | Provide a television  Television must be enclosed in professionally crafted millwork unless a wall mounted flat panel television is provided | Yes |
| est Rooms | Additional Item | Additional Inspection Item | Renovate Guestrooms and Bathrooms of all FF and E  Finishes and Accessories as required    Replace / Install new plumbing and electrical systems where necessary as part of the renovation | Yes |
| est Rooms | Additional Item | Additional Inspection Item | Baymont Inn and Suites requires that 5% of the room inventory be either Leisure Room Suites (minimum 372 SF) or Standard Two Room Suites (minimum 535 SF)  All FF and E is required to comply with pre approved Baymont design schemes | Yes |
| est Rooms | Bathroom Finishes | Flooring | Replace / Install flooring and base | Yes |

ign Envelope ID  02885DC9 8C55-41AD BBFD 7063E11CFE68

## Be Completed Prior To Opening

| Category | Sub Category | Item Description | Required Action Description | Design/ Brand Approval Required |
|---|---|---|---|---|
| est Rooms | Bathroom Finishes | Doors/ Walls Ceilings/ Outlets/ Switches | Replace wall covering<br><br>Clean  repair and paint ceilings<br><br>Provide outlet covers and faceplates | Yes |
| est Rooms | Bed / Bedding | Top of Bed (including bed skirt) | Replace / Provide bed toppings | |
| est Rooms | Bed / Bedding | Bed Frame/Mattress  Simmons Beautyrest Sutherland Plush (Existing acceptable until 10 years or Major)/Box Spring | Replace / Install bed sets (mattresses and box springs) | |
| est Rooms | Bed / Bedding | Linens (WynRest where applicable) and Mattress Pad | Provide a complete inventory of WynRest linen to include sheets  pillows  pillowcases  blankets  mattress pads and complete inventory of WynDry terry stock to include washcloths  bath mats and bath and hand towels | |
| est Rooms | Case Goods | Dresser  Credenza or Media Chest (2 drawers) | Replace / Provide case goods package (headboards  nightstands  dressers  tables  desks and wall mirrors) as required | |
| est Rooms | Case Goods | Lounge Chair(s)/Sofa(s) | Replace / Provide seating package as required | Yes |
| est Rooms | Case Goods | Wall Pictures  Framed Wall Mirror or Framed Full Length Mirror | Provide artwork package | |
| est Rooms | Closet | Closet Rod/Shelf/wooden & hook style Hangers (6  2 w/ skirt clips) | Replace clothes racks<br><br>Replace / Provide hangers as required | Yes |
| est Rooms | Doors / Windows / Locks | Entrance Door Locks (including secondary locks) | Replace / Install electronic device on entrance doors<br><br>Replace / Install secondary locks on entrance doors | |
| est Rooms | Doors / Windows / Locks | Connecting Door Locks | Replace connecting door locks | |
| est Rooms | Doors / Windows / Locks | Drapes/Sheers/Cords/Valance | Replace / Install window treatments | Yes |
| est Rooms | Guestroom Appliances / Supplies | Telephone/Dialing Instructions | Provide telephones and faceplates | |
| est Rooms | Guestroom Appliances / Supplies | Luggage Rack | Provide folding luggage racks as required | |
| est Rooms | Guestroom Appliances / Supplies | PTAC/Odor/Temp | Replace / Provide PTAC units | Yes |
| est Rooms | Guestroom Appliances / Supplies | Smoke Detector | Ensure each guestroom is equipped with a smoke detector | |
| est Rooms | Guestroom Finishes | Flooring | Install carpet  pad and base | Yes |
| est Rooms | Guestroom Finishes | Doors/ Walls Ceilings/ Outlets/ Switches | Replace / Install wall covering as required<br><br>Clean  repair and paint ceilings<br><br>Provide outlet covers and faceplates as required | Yes |
| est Rooms | Lighting | Light Fixtures | Replace / Provide lamp package and shades | Yes |
| est Rooms | Television | Television | Replace / Provide televisions | Yes |
| est Rooms | Tub / Shower | Shower Curtain | Replace / Provide shower curtains | Yes |
| est Rooms | Tub / Shower | Shower Head | Replace / Provide showerheads | Yes |
| est Rooms | Tub / Shower | Shower Rod | Replace / Provide shower rods | |

uSign Envelope ID 02885DC9 8C55-41AD BBFD 7063E11CFE68

## o Be Completed Prior To Opening

| Category | Sub Category | Item Description | Required Action Description | Design/ Brand Approval Required |
|---|---|---|---|---|
| uest Rooms | Tub / Shower | Tub | Replace / Install bathtub/shower wall surrounds<br><br>Replace / Provide bathtubs | Yes |
| uest Rooms | Tub / Shower | Plumbing Fixtures | Replace / Provide bathtub plumbing fixtures | |
| uest Rooms | Vanity / Commode | Vanity w/ skirt and backsplash/Sink | Replace / Provide vanity/sink units | Yes |
| uest Rooms | Vanity / Commode | Light Fixture | Replace/ Provide vanity lighting | Yes |
| uest Rooms | Vanity / Commode | Mirror | Replace / Install vanity mirrors | Yes |
| uest Rooms | Vanity / Commode | Plumbing Fixtures | Replace / Provide sink plumbing fixtures | Yes |
| uest Rooms | Vanity / Commode | Towel Bar/Shelf | Replace / Provide towel shelf/bar units | Yes |
| ublic Areas | Building Exterior | Roof/Soffits/Gutters/Downspouts | Replace metal mansard roof around proposed Baymont building is required to improve the property's curb appeal (e g parapet cornice etc ) | Yes |
| ublic Areas | Building Exterior | Stairwell/Stair Tower | Construct covered staircase towers over exposed staircases and incorporate Company design features | Yes |
| ublic Areas | Building Exterior | Doors / Windows | Replace windows where damaged or seals are broken (fogged appearance) | |
| ublic Areas | Building Exterior | Facade/Fascia/Storefronts | Demolish guestrooms and corridors that are not part of the proposed Baymont as planned Repair / Refinish affect areas to a like new condition<br><br>Install a new exterior finish system such as stucco synthetic stucco or similar on proposed Baymont building<br><br>Clean repair and paint Conference Center building exterior in entirely to visually separate from the proposed Baymont guestroom building to provide a consistent appearance | Yes |
| ublic Areas | Building Exterior | HVAC Louvers/Railings | Replace PTAC louvers | Yes |
| ublic Areas | Building Exterior | Porte Cochere/Canopy | Construct a porte cochere at the new lobby entrance and incorporate a Company design feature into new structure | Yes |
| ublic Areas | Business Center | Finishes - Flooring/Ceiling/Walls/Doors/Window Treatment | Construct new Business Services Area adjacent to and open to the Lobby Area | Yes |
| ublic Areas | Exterior Grounds | Dumpster Enclosure | construct a Dumpster new enclosure Dumpster is to be screened from view | |
| ublic Areas | Exterior Grounds | Landscaping/Fencing | Install / Upgrade landscaping at site perimeter landscape islands building perimeters by eliminating weeds and providing perennial and annual landscaping, and ground cover as required | |
| ublic Areas | Exterior Grounds | Lighting | Replace walkway and building lighting | Yes |
| ublic Areas | Exterior Grounds | Parking Lot/Curbs/Wheel Stops/Striping | Resurface and slope parking lot in entirely | |
| ublic Areas | Exterior Grounds | Walkways | Clean and refinish (stain or paint) walkways throughout property to provide a consistent appearance | |
| ublic Areas | Fitness Room | Finishes Flooring/Ceiling/Walls/Doors/Window | Provide an on site exercise room and equip as required Must use approved Baymont equipment package from Hotel Fitness | Yes |
| ublic Areas | Ice/Vending | Equipment Vending/Ice | Provide ice and vending machines as required | |
| ublic Areas | Interior Corridors/Stairwells | Finishes Doors/Ceilings/Walls/Windows/Window Treatment | Renovate guestroom corridors and stairwells of all FF and E Finishes and Accessories | Yes |
| ublic Areas | Laundry | Finishes Flooring/Ceiling/Walls/Doors/Window | Provide a guest laundry and equipment as required | Yes |
| ublic Areas | Lobby | Finishes Doors/Ceilings/Walls/Windows/Window Treatment | Construct a lobby/registration area as required | Yes |
| ublic Areas | Meeting Room / Board Room | Finishes Ceiling/Walls/Doors/Window/Window Treatments | Provide a meeting room with required minimum seating | Yes |
| ublic Areas | Public Restrooms | Finishes Ceiling/Walls/Entrance doors | Provide a public restroom and equip as required | Yes |

/Sign Envelope ID 02885DC9 8C55-41AD BBFD 7063E11CFE68

## o Be Completed Prior To Opening

| Category | Sub Category | Item Description | Required Action Description | Design/ Brand Approval Required |
|---|---|---|---|---|
| ublic Areas | Signage/Vehicles | Room number signs / Interior signage / Directional Signage | Provide approved interior/directional signage and room number plaques per Brand graphic standard specifications. Existing signage that is logod or has a style or color that is associated with another brand or incompatible with current Brand Standards, or if signs are missing from required places must be replaced or installed | |
| ublic Areas | Signage/Vehicles | Building / Primary Signage | Provide approved exterior signage per Brand graphic standard specifications For exterior signage a fully executed prepaid contract with an approved sign vendor must be provided prior to commencement Please contact a property openings manager at 800 343 7639 for approved sign vendor information | |

iSign Envelope ID  02885DC9 8C55-41AD BBFD 7063E11CFE68

## Franchise Quality Observations

The following items were observed during the recent visit to your property and may impact the overall satisfaction of your guests   These items are not part of your Property Improvement Plan (PIP), but are subject to grading on any future Franchise Quality evaluation if not addressed

| Category | Sub Category | Item Description | Required Action Description | Quality Concern |
|---|---|---|---|---|
| Administrative Services | General | Is the property compliant to the current non smoking standard? | Provide non smoking rooms as required | General Compliance |
| Administrative Services | General | Uniforms/Name Tags | Provide uniforms and name tags for all associates as required | General Compliance |
| Administrative Services | Training & Certifications | ELO Training/Conference Attendance | Complete Hospitality Management Program (H M P) as required | General Compliance |
| Administrative Services | Training & Certifications | Wyndham Rewards Training/Count on Me!Service Culture | Property manager is required to be Wyndham Rewards certified and property must fully comply with all Wyndham Rewards requirements | General Compliance |
| Guest Rooms | Guestroom Appliances / Supplies | Guestroom Supplies | Provide guestroom/bath supplies to include amenities package | General Compliance |
| Guest Rooms | Lighting | CFL Light bulbs(100 Watt Equiv) | Compact fluorescent energy saving light bulbs are required to be installed in the guestroom and guestroom bath areas | General Compliance |

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this ___February 8___ day of ___18___, 20___, ('Amendment Date") by and between **BAYMONT FRANCHISE SYSTEMS, INC.,** a Delaware corporation ("we", 'us' or 'our"), **TANZAM LLC, a Louisiana limited liability company** ("you", or "your") and **KIRIT PATEL, GIRISH PATEL and ARCHNA PATEL** (the "Guarantors") This Amendment supplements that certain Franchise Agreement dated ___, (the " Franchise Agreement"), relating to your development of a **Baymont® Chain Facility** to be located at **42309 S Morrison Blvd, Hammond, LA 70403,** which is designated as Unit **#02002-11589-06** (the "Facility") Terms not otherwise defined in the Amendment shall be defined as provided in the Franchise Agreement

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows

1    The Franchise Agreement is hereby amended to add the following Section **18.5;**

18 5 **Excluded Rooms Operation** The parties acknowledge that, as of the Effective Date, the Facility contains 120 guest rooms You are authorized, however, to open for Chain guests, after completing any pre-opening Improvement Obligation, 59 (fifty nine) rooms ( Franchised Rooms' ) At your request, you are authorized to exclude the 61 (sixty one) remaining guest rooms ('Excluded Rooms") which shall have all furniture, fixtures including carpet, clothes rack and plumbing fixtures (sink, faucet, faucet controls and shower head) removed so that the Excluded Rooms will not be capable of rental to any guests The Excluded Rooms will contain no Marks, Mark-bearing supplies or materials, or any other System identification You will not place any Excluded Rooms in service as Franchised Rooms at the Facility until renovated to meet System Standards for entering conversion rooms, and we inspect and approve the Excluded Rooms for each Excluded Room to be added as a Franchised Room No room addition fee shall be due in the event of any such opening The first time you violate this Section and rent an Excluded Room to a Chain guest, the violation will be treated as a default under Section 11 1 Your second violation of this Section will be treated as endangering the health and safety of guests, resulting in a non-curable default under Section 11 2 We understand that you may wish, in the future, to modify the Facility and the Location by demolishing the 61 Excluded Rooms (the "Demolition") We consent to such Demolition provided that (a) you submit within sixty (60) days prior to the Demolition a proposal and plans for the Demolition, (b) the Franchise Rooms in the Facility are properly maintained and comply with System Standards at all times including during any Demolition, (c) you take all necessary safety precautions during the Demolition of any part of the Facility, (d) you conduct any and all renovations for the remaining portion of the Facility to ensure that the Facility operates in accordance with System Standards, and (e) you do not construct or in any way operate a guest lodging facility on the site of the Demolition

2    Confidentiality   You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you   Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits   Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you   Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only   If you violate this confidentiality obligation, no further benefits will be available fio that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us

3    Release   You and Guarantors, on behalf of yourselves, your partners, officers, employees, director4, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the Franchise Agreement for the Facility

4    Except as expressly stated in this Amendment, no further additions, modification or deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment

5    Execution in Counterparts   To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required, and it shall not be necessary that the signatures on behalf of each party appear on each counterpart, but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts   All counterparts shall collectively constitute a single agreement   It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto   All facsimile executions shall be treated as originals for all purposes

ocuSign Envelope ID 326018DF-6F2A     3189 0C1703FBD0BE

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above

**BAYMONT FRANCHISE SYSTEMS, INC.,**



By _____

    Michael Piccola, SVP

**TANZAM LLC**



By _____

    **Kirit Patel**
    **Manager**

**GUARANTORS:**



By _____

    **Kirit Patel**

By _____

    **Girish Patel**

By _____

    **Archna Patel**



# Certificate Of Completion

Envelope Id  326018DF6F2A4783B1890C1703FBD0BE                                   Status  Completed
Subject  Amendment BAY Hammond LA #02002 v 02 05 18 pdf
Source Envelope
Document Pages  3                    Signatures  5                    Envelope Originator
Certificate Pages  4                 Initials  0                      Tina Ann Stafford
AutoNav  Enabled                                                      22 Sylvan Way
EnvelopeId Stamping  Enabled                                          Parsippany, NJ  07054
Time Zone  (UTC-08 00) Pacific Time (US & Canada)                     tina stafford@wyn com
                                                                      IP Address  204 160 206 20

## Record Tracking

Status  Original                    Holder  Tina Ann Stafford              Location  DocuSign
        2/6/2018 6 46 05 AM                 tina stafford@wyn com

## Signer Events | Signature | Timestamp

**Kirit Patel**
kpateldaysinn@gmail com
Security Level  Email, Account Authentication
(None)

Signature: Kirit Patel — DocuSigned by — 42838E3A0021487

Using IP Address  99 114 209 194

Sent  2/6/2018 6 51 08 AM
Viewed  2/6/2018 7 13 15 AM
Signed  2/6/2018 9 48 19 AM

**Electronic Record and Signature Disclosure**
   Accepted  2/6/2018 7 13 14 AM
   ID  cceb1e70-a105 4814-baa5 b71bdec3327c

**Girish Patel**
Gpatel725@gmail com
Security Level  Email, Account Authentication
(None)

Signature: Girish Patel — DocuSigned by — 83AE5DEF19C44E8

Using IP Address  172 9 185 33
Signed using mobile

Sent  2/6/2018 6 51 08 AM
Viewed  2/6/2018 10 13 22 PM
Signed  2/6/2018 10 13 40 PM

**Electronic Record and Signature Disclosure**
   Accepted  2/6/2018 10 13 22 PM
   ID  a0bf8b06-f612 4817 88a5 dcac9b98fd64

**Archna Patel**
Prakash3950@yahoo com
PRAKASH PATEL/MANAGING MEMBER
Security Level  Email, Account Authentication
(None)

Signature: Archna Patel — DocuSigned by — CC6AA7BF16DD45C

Using IP Address  107 77 231 233
Signed using mobile

Sent  2/6/2018 6 51 08 AM
Viewed  2/6/2018 8 51 45 AM
Signed  2/6/2018 8 53 48 AM

**Electronic Record and Signature Disclosure**
   Accepted  2/6/2018 8 51 45 AM
   ID  48f89a24-75a4-42b3-a3db-aa390a7c02df

**Wendy Emmons**
wendy emmons@wyn com
Contracts Coordinator
Wyndham Hotel Group
Security Level  Email, Account Authentication
(None)

## Completed

Using IP Address  167 124 126 1

Sent  2/6/2018 10 13 41 PM
Viewed  2/8/2018 8 18 36 AM
Signed  2/8/2018 12 45 10 PM

**Electronic Record and Signature Disclosure**
   Not Offered via DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Kendra Mallet<br>kendra mallet@wyn com<br>Manager, Contracts Administration<br>Wyndham Hotel Group<br>Security Level  Email  Account Authentication (None)<br>**Electronic Record and Signature Disclosure**<br>    Not Offered via DocuSign | **Completed**<br><br>Using IP Address  167 124 126 1 | Sent  2/8/2018 12 45 12 PM<br>Viewed  2/8/2018 12 50 10 PM<br>Signed  2/8/2018 12 50 21 PM |
| Michael Piccola<br>mike piccola@wyn com<br>Senior Vice President<br>Wyndham Hotel Group<br>Security Level  Email  Account Authentication (None)<br>**Electronic Record and Signature Disclosure**<br>    Not Offered via DocuSign | DocuSigned by<br>*Michael Piccola*<br>29FA2031CB45440<br><br>Using IP Address  167 124 126 1 | Sent  2/8/2018 12 50 22 PM<br>Viewed  2/8/2018 12 53 26 PM<br>Signed  2/8/2018 12 53 29 PM |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Craig Frazier<br>craig frazier@wyn com<br>Security Level  Email  Account Authentication (None)<br>**Electronic Record and Signature Disclosure**<br>    Not Offered via DocuSign | **COPIED** | Sent  2/6/2018 6 51 08 AM |
| Tom Sharpin<br>thomas sharpin@wyn com<br>Security Level  Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure**<br>    Not Offered via DocuSign | **COPIED** | Sent  2/6/2018 6 51 08 AM |

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/8/2018 12 50 22 PM |
| Certified Delivered | Security Checked | 2/8/2018 12 53 26 PM |
| Signing Complete | Security Checked | 2/8/2018 12 53 29 PM |
| Completed | Security Checked | 2/8/2018 12 53 29 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclo    eated on  7/28/2016 10 04 39 AM

Parties agreed to  Kirit Patel  Girish Patel, Archna Patel

.

# ELECTRONIC SIGNATURE CONSENT AND DISCLOSURE

The documents included herein (collectively, â€œElectronically Signed Documentsâ€?) are being offered to you by Wyndham Hotel Group, LLC or one of its affiliates (â€œweâ€?, â€œusâ€?, â€œourâ€?, or â€œWHGâ€?) for your signature through electronic processes  Your consent to sign the Electronically Signed Documents electronically applies only to the Electronically Signed Documents included herewith and to no other documents  Please read the information below carefully and thoroughly, and if you can access this information electronically and agree to these terms and conditions, please confirm your agreement by clicking the â€œI agreeâ€? button at the bottom of this document

## Obtaining Paper Copies

Obtaining Paper Copies At any time  you may request from us a paper copy of this Electronic Signature Consent and Disclosure or the Electronically Signed Documents that have been made available electronically to you by WHG  You will also have the ability to download and print the Electronically Signed Documents during and immediately after your electronic signing session  If you wish to request a paper copy of Electronically Signed Documents please contact Paul Ramos at  paul ramos@wyn com

## Customer Support

Should you need technical support, you may call (866) 219-4318 for U S  and Canadian residents, or +44 (0) 800 098 8113 for European residents  You can also send an email to service@docusign com

## Required Hardware and Software

Browsers
 Latest stable release (except where noted) Internet ExplorerÂ® (8 0 or above, compatibility mode is supported only for 9 0 and above), Windows Edge, MozillaÂ® FirefoxÂ®, Safariâ„¢, Google ChromeÂ®

Mobile Signing
 Apple iOSÂ® 7 0 or above  Androidâ„¢ 4 0 or above

Mobile Applications
 Apple iOSÂ® 8 0 and above, Androidâ„¢ 4 0 and above, Windows 8 1 and above, Windows 10, Windows Phone 8 1

PDF Reader
 PDF reader software may be required to view and print PDF files

Screen Resolution
1024 x 768 minimum

Enabled Security Settings
Allow per session cookies

** These minimum requirements are subject to change  Pre-release (e g  beta) versions of operating systems and browsers are not supported

## Acknowledging Access/Consent to Receive and Sign Documents Electronically

To confirm to us that you can access this information electronically, please verify that you were able to read this Electronic Signature Consent and Disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to email this consent and disclosure to an address where you will be able to print on paper or save it for your future reference and access Further, if you consent to executing the Electronically Signed Documents electronically, have read the terms and conditions described above, and agree to accept them, please indicate your acceptance by clicking the "I agree" button below

By checking the "I agree" box, you confirm and agree that

- You can access and read this Electronic Signature Consent and Disclosure and you have satisfied the software and hardware requirements described above,
- You can print on paper this Electronic Signature Consent and Disclosure or save or send this page to a place where you can print it, for future reference and acces
- You consent to receive this Electronic Signature Consent and Disclosure and the Electronically Signed Documents electronically in lieu of a paper copy (provided that you may withdraw consent at any time and request a paper copy),
- You are authorized to execute the Electronically Signed Documents and as such you authenticate that you are the individual to whom the Electronically Signed Documents is directed, and
- You agree that your use of electronic processes provided by us to establish your acceptance of the Electronically Signed Documents constitutes your electronic signature and signifies your intent to be bound

     I agree

# EXHIBIT B

cuSign Envelope ID  02885DC9 8C55      BBFD-7063E11CFE68

Facility      **HAMMOND, LA**
File No       **02002-11589-06**
Brand         **BAYMONT**

## SynXis Subscription Agreement

This SynXis Subscription Agreement (' **Agreement** ), effective as of ____February 8____, 20__18__ (the **Effective Date** ), by and between **Baymont Franchise Systems, Inc** , a **Delaware** corporation ( **Franchisor"**), and **TANZAM LLC**, a(n) **Louisiana limited liability company** ( **Franchisee** ), governs Franchisee s access to and use of the SaaS Solution and Services as described herein  Franchisor and Franchisee shall each be referred to herein as a  **Party**  and together as the  **Parties**  to this Agreement

For and in consideration of the mutual covenants, representations and promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the foregoing and as follows

1.  **GENERAL**

    **1.1    Definitions**  Capitalized terms used herein shall have the meanings ascribed to them in this Agreement or in any Schedules attached hereto, which may be updated or supplemented by Franchisor from time to time, or as defined in <u>Schedule 1 1</u>  All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise Agreement and are incorporated herein by reference

    **1.2    Conflicts in Interpretation.**  The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Schedules attached hereto  (a) first, the terms contained in the body of this Agreement, and (b) second, the terms of the Schedules attached to this Agreement, provided that no order of precedence shall be applied among such Schedules

2   **DESCRIPTION OF SAAS SOLUTION**

    **2.1    The SaaS Solution**  The  **SaaS Solution'** means the computer program, applications, features and services expressly identified on <u>Schedule 2 1</u> and any and all modifications, corrections, updates and enhancements to such SaaS Solution, including any Franchisor may from time to time make available to Franchisee  The SaaS Solution does not include any Non-SaaS Solution Services as specified in Section 7

    **2.2    Elavon Hosting Services Agreement.**  In order to access and use the SaaS Solution pursuant to this Agreement, on or before ten (10) days following the Effective Date, Franchisee shall execute that certain Hosted Services Agreement for Hosted Gateway Services directly with Elavon Inc , or a substantially similar agreement with an alternate vendor designated by Franchisor, ( **Elavon Agreement** )  The Elavon Agreement exclusively covers the offering provided thereunder (the  **Elavon Non-SaaS Solution Services** )

    **2 3    Implementation Services**  On a date after which Franchisee has signed both the Elavon Agreement and this Agreement, Franchisor shall use reasonable efforts to implement the SaaS Solution as described in <u>Schedule 2 3</u> attached hereto (the  **Implementation Services** ) and Franchisee shall follow all of Franchisor's instructions for preparing the Facility, at Franchisee s sole expense, for implementation of the SaaS Solution  The SaaS Solution shall be deemed accepted by Franchisee ( **Acceptance'**) immediately upon implementation of the

1

SaaS Solution by Franchisor (the "**Acceptance Date**")

## 3   GRANT OF RIGHTS

**3.1   License.**   Subject to payment of all applicable fees, Franchisor hereby grants to Franchisee a limited, non-transferable, non-exclusive license, to access, use and display the SaaS Solution during the Term solely for the Permitted Use and solely by End Users in accordance with the terms and conditions set forth in this Agreement

**3.2   Limitations.**   Except as provided in Section 3.1, all rights title and interests in and to the SaaS Solution are reserved to Franchisor or to any Third Party who licenses the SaaS Solution to Franchisor or to Franchisor's Affiliates

**3.3   Title.**   Title to and ownership of the SaaS Solution, including all Intellectual Property rights therein, is and shall remain with Franchisor its Affiliates or any Third Party who licenses it to Franchisor   Franchisee shall at all times protect and defend, at Franchisee's own cost and expense, Franchisor's rights, title and interests in and to the SaaS Solution against all claims, liens and legal processes of Franchisee's creditors

**3.4   Restrictions**   Franchisee shall not (a) permit any unauthorized Third Party to access or use the SaaS Solution, (b) create or attempt to create any derivate works based on the SaaS Solution, (c) copy, frame or mirror any part or content of the SaaS Solution, (d) disassemble, decompile, reverse engineer or otherwise attempt to recreate the SaaS Solution, or (e) access, use or otherwise manipulate the SaaS Solution in order to create a competitive product or service or to copy any features, functions or graphics of the SaaS Solution   Franchisor may, at its sole discretion and without prior notice to Franchisee, conduct audits of Franchisee's Hardware, computer systems and applications   including audits by electronic and remote means, to verify conformance with this Agreement

**3.5   Suggestions.**   Any suggestions and feedback relating to the SaaS Solution or Services or relating to any desired or recommended additional features, enhancements or modifications to the SaaS Solution or Services that are provided by or through Franchisee or its Affiliates to Franchisor shall be the exclusive property of Franchisor as of the date it is offered to Franchisor and Franchisee and its Affiliates hereby assign all rights and interests in and to such suggestions and feedback to Franchisor as of the date it is offered to Franchisor

## 4   SERVICES

**4.1   Additional Services**   Franchisor may perform additional services agreed to in writing by the parties from time to time, which may include additional fees to be agreed to by the Parties (the "Additional Services")

**4.2   Rate Audit Services.**   From time to time, Franchisor may provide services to Franchisee under Franchisor's Central Rate and Inventory Support Program (the "**CRISP Services**") consistent with Schedule 4.2 attached hereto, which may be updated or supplemented by Franchisor from time to time

**4.3   Maintenance and Support Services**   Subject to Franchisee performing all Franchisee Responsibilities identified in Schedule 4.3 ("**Franchisee Responsibilities**")   Franchisor shall provide maintenance and support services as set forth on Schedule 4.3 attached hereto ("**Maintenance and Support Services**")

**4.4    Access Credentials** Franchisor, directly or indirectly, shall provide Access Credentials to Franchisee Franchisor may, from time to time and in its sole discretion, change or require Franchisee to change Franchisee s Access Credentials Franchisee must follow all security procedures and protocols that Franchisor may from time to time establish or modify Franchisee shall not permit the SaaS Solution to be accessed in violation of the security procedures and protocols as set forth herein Franchisee shall safeguard any Access Credentials that Franchisor provides to Franchisee as a trade secret, and shall reveal such information only to its End Users on a need to know basis Franchisee shall immediately inform Franchisor if Franchisee has knowledge or a reasonable basis to believe that its Access Credentials have been lost, stolen misappropriated or compromised in any way or manner, and Franchisee shall strictly follow Franchisor s instructions regarding any replacement Access Credentials Franchisee shall be responsible for all access or use through its Access Credentials

**4 5    Permitted Uses** Franchisee shall use the SaaS Solution only for the Permitted Uses with respect to the business and operations of Franchisee as contemplated in the Franchise Agreement Franchisee shall not load store or otherwise use any software on or with the SaaS Solution, without Franchisor s prior written consent, as the use of such software may adversely affect the operation and functionality of the SaaS Solution and the Services If Franchisee violates this Section, the warranties set forth in this Agreement shall be void and Franchisee shall be solely responsible for the cost of repair or replacement of the SaaS Solution, if any

**4 6    Franchisor's Responsibilities.** Franchisor shall (a) use commercially reasonable efforts to make the SaaS Solution available twenty-four (24) hours a day, seven (7) days a week, except for (i) planned downtime, or (ii) any unavailability caused by circumstances beyond Franchisor s reasonable control, including without limitation, acts of nature, acts of government floods, fires, earthquakes, civil unrest, acts of terror labor strikes, Internet service provider failures or delays, or denial of service attacks, and (b) provide the SaaS Solution only in accordance with applicable laws and government regulations that govern the implementation of the SaaS Solution

**4 7    Franchisee's Responsibilities.** Franchisee shall (a) be fully responsible for its End Users compliance with this Agreement, (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent collected by Franchisee or its employees, agents or representatives, and for the means by which Franchisee or its employees, agents or representatives acquires Guest Information, (c) prevent unauthorized access to or use of the SaaS Solution, and notify Franchisor promptly of any such unauthorized access or use, and (d) use the SaaS Solution only in accordance with this Agreement and applicable laws and government regulations Franchisee shall not (i) make the SaaS Solution available to anyone other than authorized End Users, (ii) sell, resell, rent or lease the SaaS Solution, (iii) use the SaaS Solution to store or transmit infringing libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party, (iv) use the SaaS Solution to store or transmit software viruses, malicious code or other harmful files, (v) interfere with or disrupt the integrity or performance of the SaaS Solution or the data of any Third Party contained therein, or (vi) attempt to gain unauthorized access to the SaaS Solution or any related networks

## 5.    FEES AND PAYMENTS

**5.1    Fees.** Franchisee shall pay all fee amounts specified in <u>Schedule 5 1</u> to this Agreement for the SaaS Solution and the Services ( **Fees**' ) for at least the period beginning on the Acceptance Date through the end of the Commitment Period and continuing for the duration of

the Term  If Franchisee's franchise involves the transfer of an existing Chain Facility to Franchisee or changing affiliation of the Facility from one Wyndham Hotel Group-owned franchise system to another Franchisee will be charged a transfer fee ( **Transfer Fee** ) Franchisee may also request additional training services, which Franchisor may provide to Franchisee for an additional fee Franchisor may charge an additional fee for services under Section 5 4, if acceleration is at Franchisee's request

**5 2    Payments.** Franchisor may apply any amounts received to any outstanding invoices in any order If Franchisee does not make all payments of Fees to Franchisor when due, then, upon written notice to Franchisee, Franchisor may withhold implementation, suspend the SaaS Solution (subject to Section 5 4 below) or terminate this Agreement All amounts due hereunder are due upon receipt of the invoice Franchisor may increase the ongoing Fees on an annual basis by no more than five percent (5%) above the fees paid by Franchisee during the immediately preceding twelve (12) month period provided, however, that Franchisor shall notify Franchisee no less than thirty (30) days prior to any such increase taking effect In the event that a Commitment Period applies, Franchisor will not increase such Fees during the Commitment Period

**5 3    Overdue Charges.** If any charges are not received from Franchisee by the due date, then at Franchisor s sole discretion, (a) such charges may accrue late interest at the rate of 1 5% of the outstanding balance per month, or the maximum rate permitted by law whichever is lower from the date such payment was due until the date paid, and/or (b) Franchisor may condition future subscription renewals on payment terms shorter than those specified in Section 5 1 above (Fees)

**5 4    Suspension of Service and Acceleration** If any Fees owing by Franchisee under this Agreement for the SaaS Solution and Services is thirty (30) or more days overdue, Franchisor may, without limiting any other rights and remedies it may have, accelerate Franchisee s unpaid fee obligations under this Agreement so that all such obligations become immediately due and payable, and suspend the SaaS Solution and Services to Franchisee until such amounts are paid in full Franchisor shall give Franchisee at least seven (7) days prior written notice that Franchisee s account is overdue, in accordance with Section 17 1 (Notices), before suspending the SaaS Solution and Services to Franchisee

**5 5    Taxes.** Unless otherwise stated, Franchisor's Fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including but not limited to value-added, sales, use or withholding taxes, assessable by any local state, provincial, federal or foreign jurisdiction (collectively, ' **Taxes** ) Franchisee is responsible for paying all Taxes associated with its purchases hereunder If Franchisor has the legal obligation to pay or collect Taxes for which Franchisee is responsible under this section the appropriate amount shall be invoiced to and paid by Franchisee, unless Franchisee provides Franchisor with a valid tax exemption certificate authorized by the appropriate taxing authority For clarity, Franchisor is solely responsible for taxes assessable based on Franchisor s income property and employees

## 6    TECHNICAL SPECIFICATION REQUIREMENTS

**6.1    Minimum Technical Requirements** To access and use the SaaS Solution, Franchisee must use Hardware and subscribe to Communication Services that meet Franchisor s technical specification requirements set forth on <u>Schedule 6 1</u> If any service provider(s) (including without limitation, any service provider made available by Franchisor), at Franchisee s request, attempts to integrate Hardware with the SaaS Solution or Services, Franchisor shall not be

liable for any injury or damage to either the Hardware or the SaaS Solution unless such injury or damage is due to Franchisor s gross negligence or willful misconduct For the avoidance of doubt the warranties and support described in this Agreement do not apply to any Hardware or Communication Services

## 7   NON-SAAS SOLUTION SERVICES PROVIDERS

**7 1   Acquisition of Non-SaaS Solution Services** Franchisor or a Third Party may from time to time make available to Franchisee offerings designed to interoperate with the SaaS Solution ( **Non-SaaS Solution Services** ) Any acquisition by Franchisee of such Non-SaaS Solution Services, and any exchange of data between Franchisee and any Non-SaaS Solution Services provider is solely between Franchisee and the Third Party that provides the applicable Non-SaaS Solution Services

**7 2   No Representation or Warranty.** Franchisor does not warrant or support any Non-SaaS Solution Services Any Non-SaaS Solution Services shall be governed exclusively by any agreement entered into between Franchisee and the Third Party that offers the applicable Non-SaaS Solution Services If the provider of any Non-SaaS Solution Services ceases to make such Non-SaaS Solution Services available for interoperation with the SaaS Solution on reasonable terms, Franchisor may, in its sole discretion, cease providing access to such Non-SaaS Solution Services without entitling Franchisee to any refund, credit, or other compensation

## 8.   CONFIDENTIALITY

**8 1   Definition of Confidential Information.** As used herein, **Confidential Information'** means all confidential information disclosed by a Party ( **Disclosing Party** ) to the other Party ( **Receiving Party** ), whether orally or in writing that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure Franchisor s Confidential Information shall include the SaaS Solution and Services Confidential Information of each Party shall include the terms and conditions of this Agreement, as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such Party However, Confidential Information shall not include any information that (a) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party, (b) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party, (c) is received from a Third Party without breach of any obligation owed to the Disclosing Party, or (d) was independently developed by the Receiving Party

**8 2   Protection of Confidential Information** The Receiving Party shall (a) use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but in no event less than reasonable care), (b) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, and (c) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates employees contractors and agents who need such access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those herein Neither Party shall disclose the terms of this Agreement to any Third Party other than its Affiliates and their legal counsel and accountants without the other Party s prior written consent

5

**8.3    Compelled Disclosure** The Receiving Party may disclose Confidential Information of the Disclosing Party if it is compelled by law to do so provided the Receiving Party gives the Disclosing Party prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure If the Receiving Party is compelled by law to disclose the Disclosing Party s Confidential Information as part of a civil proceeding to which the Disclosing Party is a party and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to such Confidential Information

## 9    DATA PRIVACY

**9.1    Data Policies.** Franchisee shall comply with and abide by Franchisor s data policies and procedures which Franchisor may, at its sole discretion and without prior notice, update from time to time (the **Data Policies** ) If there is a conflict between the Data Policies and applicable law, Franchisee should comply with applicable law and immediately notify Franchisor in writing of such conflict

**9 2    Guest Information** Franchisor and/or its Affiliate shall own all Guest Information that is within the possession of Franchisor and/or Franchisor s Affiliate or any service provider holding such information on Franchisor's or a Franchisor Affiliate s behalf and Franchisee shall own all Guest Information that is within the possession of Franchisee or any Franchisee service provider holding such information on Franchisee's behalf To the extent that Franchisor (including its Affiliates) and Franchisee both possess identical Guest Information, Franchisor s (including its Affiliates ) and Franchisee s respective ownership rights with regard to such Guest Information shall be separate and independent from one another Franchisee acknowledges and agrees that (a) Franchisee shall take all commercially reasonable steps to assure the timely and accurate collection, recording processing and transmittal of the Guest Information to the SaaS Solution at all times, and (b) with respect to Franchisee s use of the Guest Information, Franchisee shall comply with all applicable laws, Franchisor s Data Policies and any contract or promise Franchisee makes with or to any of its guests

**9 3    Non-Owned Information** Other than the Guest Information Franchisee shall not use any information it obtains from the SaaS Solution, including but not limited to any information that Franchisor appends to the Guest Information ( **Non-Owned Information** ), for the benefit of any business, enterprise or activity other than the business of the Facility, and in accordance with all applicable laws and Franchisor s Data Policies Franchisee shall not disclose, copy, assign, transfer, lease, rent, sell, donate, disseminate or otherwise commercialize any Non-Owned Information for any other purpose without Franchisor s prior written consent, which Franchisor may withhold at its sole discretion

**9 4    Dummy Information** Any information provided to Franchisee from the SaaS Solution may contain "dummy information, special codes or other devices to assure compliance with this Agreement and monitor possible unauthorized use of SaaS Solution Franchisee shall be conclusively presumed to have violated this Agreement if Franchisor discovers any unauthorized mail or contacts from information provided only to Franchisee or the Facility

**9 5    Improper Access.** If Franchisee should obtain access to Non-Owned Information in violation of the Data Policies or this Agreement, Franchisee shall be a trustee of that information and must act in a fiduciary capacity to protect the information from further unauthorized use or disclosure, and take all commercially reasonable efforts to return the

6

information to Franchisor as soon as possible

## 10    WARRANTY AND SUPPORT

**10 1    General.** Franchisor warrants that following the Acceptance Date and for a period of sixty (60) days thereafter, the SaaS Solution will perform the functions and operations in a good workmanlike manner provided that Franchisee (a) follows Franchisor s instructions, updates and modifications, (b) makes corrections, as directed, (c) pays all applicable Fees when due and (d) is not otherwise in default under this Agreement or the Franchise Agreement Franchisor s sole obligation under this warranty shall be to use reasonable efforts to remedy any nonperformance of the SaaS Solution within a reasonable time after Franchisee reports such nonperformance to Franchisor

**10.2   Intellectual Property** Franchisor has the right to provide Franchisee with the rights granted hereunder, and, to the best of Franchisor s knowledge, the SaaS Solution does not infringe any Intellectual Property rights of any Third Party

**10 3    Support.** Franchisor or its Affiliates will provide a toll-free telephone number for reporting any nonperformance of the SaaS Solution, and Franchisor or its Affiliates will use reasonable efforts to diagnose and remedy such nonperformance within a reasonable time after Franchisee reports such nonperformance to Franchisor Franchisee must perform all user-required maintenance specified by the vendor of any Hardware or Communication Services, and obtain required maintenance only from an authorized service provider

**10.4   DISCLAIMER.** THE ABOVE WARRANTIES SHALL BE RENDERED NULL AND VOID IF THE SAAS SOLUTION IS SUBJECTED TO ABUSE, MISUSE IMPROPER INSTALLATION AT THE FACILITY OR MAINTENANCE BY UNAUTHORIZED SERVICE PERSONNEL, OR IF THE SAAS SOLUTION IS ALTERED WITHOUT FRANCHISOR S EXPRESS CONSENT OR DIRECTION, OR USED FOR A PURPOSE NOT AUTHORIZED UNDER THIS AGREEMENT, OR IF THE SAAS SOLUTION IS DAMAGED OR DESTROYED DUE TO ACTS OF NATURE, WAR, TERRORISM, CIVIL UNREST, FIRES, NATURAL DISASTERS OR OTHER EVENTS BEYOND FRANCHISOR S CONTROL EXCEPT AS PROVIDED IN THIS SECTION 10, FRANCHISOR MAKES NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTY ABOUT THE SAAS SOLUTION OR ANY SERVICES, THEIR MERCHANTABILITY OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT THE FACILITY MAY ATTAIN THROUGH THE USE OF THE SAAS SOLUTION OR IN CONNECTION WITH THE RECEIPT OF ANY SERVICES OR THAT FRANCHISEE'S RESERVATIONS OR REVENUE WILL INCREASE FRANCHISEE, ON BEHALF OF ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES, RELEASES AND RENOUNCES ANY AND ALL CLAIMS OR CAUSES OF ACTION IT MAY HAVE AGAINST FRANCHISOR, FRANCHISOR S AFFILIATES, OR FRANCHISOR S OR THEIR OFFICERS, DIRECTORS OR AGENTS ARISING OUT OF THE SAAS SOLUTION, UNLESS DUE TO FRANCHISOR S WILLFUL MISCONDUCT

## 11.  INDEMNIFICATION

**11.1  Indemnification.** Franchisee shall indemnify, defend and hold harmless Franchisor, Franchisor s Affiliates its licensors and their successors and assigns and each of the respective directors officers and employees associated with them against all claims actions or proceedings arising out of or related to Franchisee s operation, use or non-use of the SaaS Solution including any use of the Guest Information or any Third Party data or system security breaches and any Non-SaaS Solution Services or agreements therefor Franchisor shall not be liable to Franchisee or any Third Party for personal injury or property loss, including but not limited to  damage to the Facility, as a result of Franchisee s operation, use or non-use of the SaaS Solution  Franchisee s receipt of Services hereunder, and/or any Third Party data or system security breaches or any Non-SaaS Solution Services or agreements therefor  Franchisee is not obligated to indemnify Franchisor for Franchisor's own gross negligence or intentional misconduct arising out of the operation, use or non-use of the SaaS Solution

## 12   NO LIABILITY FOR INFORMATION

**12.1  No Liability.** FRANCHISOR SHALL NOT BE LIABLE FOR ANY CLAIMS OR DAMAGES RESULTING FROM ANY INCORRECT INFORMATION GIVEN TO FRANCHISOR OR INPUT INTO THE SAAS SOLUTION BY ANY PERSON THAT IS NOT FRANCHISOR SUPPORT OR SERVICES HEREUNDER NECESSITATED BY COMPUTER VIRUSES, OR BY ANY FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, INCLUDING, WITHOUT LIMITATION, DAMAGE CAUSED BY PERSONS LACKING AUTHORIZED ACCESS, ARE NOT COVERED UNDER THIS AGREEMENT  FRANCHISEE WAIVES ANY CLAIMS HEREUNDER AGAINST FRANCHISOR TO THE EXTENT ARISING FROM FRANCHISEE S FAILURE TO HAVE OR MAINTAIN CURRENT VIRUS PROTECTION, OR TO THE EXTENT ARISING FROM A FAILURE OR BREACH OF FRANCHISEE S SECURITY FOR ITS SYSTEMS OR DATA  OR AS A RESULT OF ANY UNAUTHORIZED ACCESS TO FRANCHISEE S SYSTEMS

## 13   DAMAGE LIMITATION

13 1  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER FRANCHISOR NOR FRANCHISOR S AFFILIATES SHALL BE LIABLE TO FRANCHISEE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS **INDIRECT DAMAGES**") IN CONNECTION WITH THE SAAS SOLUTION OR THIS AGREEMENT, EVEN IF FRANCHISOR HAD BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE REASONABLY FORESEEN SUCH DAMAGES IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, FOR DIRECT DAMAGES CAUSED BY FRANCHISOR (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT THE ABOVE LIMITATION IS NOT RECOGNIZED BY A COURT OR OTHER AUTHORITY) ANY CLAIM SHALL BE LIMITED TO THE TOTAL AMOUNT PREVIOUSLY PAID BY FRANCHISEE TO FRANCHISOR FOR THE PREVIOUS TWELVE (12) MONTH PERIOD  THE ABOVE LIMITATIONS ON LIABILITY APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE

## 14   TERM AND TERMINATION

**14 1  Term**   This Agreement shall be effective as of the Effective Date and shall continue in full force and effect until termination of the Franchise Agreement, unless earlier terminated in accordance with the terms and conditions of this Agreement ( Term )

**14 2  Breach.**  If any one of the following events occurs then to the extent permitted by applicable law, Franchisor shall have the right to immediately terminate this Agreement  (a) Franchisee fails to make any payment when due under this Agreement or the Franchise Agreement and such failure continues uncured for a period of thirty (30) days (provided that Franchisor shall provide Franchisee with at least seven (7) days' prior notice of such overdue amount)  (b) Franchisee violates the privacy, security or confidentiality obligations set forth in this Agreement, (c) Franchisee breaches any other covenant, warranty or agreement under this Agreement, the Franchise Agreement or any other agreement between Franchisee and Franchisor or Franchisor s Affiliate and such failure continues uncured for a period of thirty (30) days after Franchisee is given written notice of such failure, (d) the SaaS Solution becomes inoperable by Franchisee s act or omission  or (e) Franchisee s Franchise Agreement expires or terminates for any reason

**14 3  Suspension**   In addition to the right to terminate this Agreement, Franchisor may suspend Franchisee s access to the SaaS Solution upon the occurrence of any of the events described in Section 14 2 until Franchisee s violation is cured and Franchisee has agreed in writing to engage in no conduct that will cause a repeat violation to occur  If Franchisee violates such a restoration agreement  Franchisor may suspend or terminate Franchisee s access to the SaaS Solution permanently or for an indefinite period  Because Franchisor still incurs costs on Franchisee s behalf, Franchisee must continue to pay all fees associated with services under the Franchise Agreement during any such suspension period

**14.4  Termination For Convenience By Franchisee.**  Following the Commitment Period, Franchisee may terminate this Agreement for convenience at any time by providing Franchisor with not less than sixty (60) days' advance written notice

**14.5  Termination For Convenience By Franchisor**   Franchisor may terminate this Agreement for convenience at any time provided that  (a) Franchisor shall provide Franchisee with no less than six (6) months' advance notice, and (b) if the effective date of such termination occurs during the Commitment Period, Franchisee will not be required to pay for the SaaS Solution and Services that it has not yet used or received for the remainder of the Commitment Period

**14.6  Upon Termination.**  Upon termination of this Agreement  (a) Franchisee s license granted under this Agreement ends and Franchisee shall immediately cease using the SaaS Solution, (b) Franchisee shall immediately cease using the Access Credentials that Franchisee was provided to access and use the SaaS Solution, and (c) Franchisee shall return the originals and all copies of non-owned Guest Information and other Confidential Information unencumbered to Franchisor within thirty (30) days after termination and certify to Franchisor in writing that the original and all copies have been returned  FRANCHISEE EXPRESSLY WAIVES ANY RIGHT TO NOTICE OF OR ANY HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY FRANCHISOR S AGENTS OR REPRESENTATIVES OR ANY PREMISES WHERE THE SAAS SOLUTION MAY BE LOCATED AND REMOVING IT WITHOUT JUDICIAL PROCESS  If Franchisee fails or refuses to permit the peaceable entry by Franchisor s agents to take possession of the SaaS Solution, Franchisee shall be

liable for rental of the SaaS Solution at the rate of $500 00 per week from the date that Franchisor first attempts to retake the SaaS Solution Franchisor may, in its sole discretion embed within the SaaS Solution various security devices that will render the SaaS Solution unusable and the data stored by the Hardware or the SaaS Solution inaccessible if this Agreement terminates

## 15    NOTICES

**15 1    General**   All notices and other communications in connection with this Agreement shall be in writing and shall be sent to the respective Parties at the addresses set forth below or to such other addresses as may be designated by each Party in writing from time to time in accordance with this section All notices and other communications shall be sent by registered or certified air mail, postage prepaid  or by express courier service, service fee prepaid All notices and other communications shall be deemed received  (a) immediately upon delivery, if hand delivered, (b) five business days after depositing in the mail, if delivered by mail  or (c) the next business day after delivery to express courier service, if delivered by express courier service

**If to Franchisor:**
**Baymont Franchise Systems, Inc**
22 Sylvan Way
Parsippany, NJ 07054
Attn SVP, Contracts Administration

**With a copy to**
Wyndham Hotel Group, LLC
22 Sylvan Way
Parsippany, NJ 07054
Attn  General Counsel

**If to Franchisee**
Tanzam LLC
42309 S Morrison Blvd
Hammond, LA 70403
Attn  Kirit Patel

**With a copy to·**

## 16.    MISCELLANEOUS

**16.1    Force Majeure.**   If performance by either Party is delayed or prevented (excluding the obligation to make payments under this Agreement) because of strikes  inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation failure of power or communications systems, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the Party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay

**16.2    Entire Agreement**   This Agreement and any attachments hereto, constitutes the entire final and exclusive agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous statements, representations, negotiations, discussions, understandings and agreements, whether oral or written, with respect to the subject matter of this Agreement

**16.3    Franchisee's Forms**   Franchisor is not bound by any terms of Franchisee s purchase order forms or notices of acceptance which attempt to impose any conditions at variance with the terms and conditions of this Agreement or with Franchisor's invoices, standards manuals or technical specifications Franchisor s failure to object to any provision contained in Franchisee s printed form is not a waiver of any provision of this Agreement

10

**16.4  No Third Party Beneficiary.** The Agreement is intended for the sole benefit and protection of the named Parties, their successors and permitted assigns, and no Third Party shall have any cause of action or right to payments made or received herein except for any owners of any software who have licensed or authorized Franchisor to sublicense the same to Franchisee

**16.5  Prevailing Party Attorneys' Fees** In the event of an alleged breach of this Agreement, the prevailing Party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys fees incurred in connection with such dispute claim or litigation including any appeal therefrom  For purposes of this Section the determination of which Party is to be considered the prevailing Party shall be decided by the court of competent jurisdiction that resolves such dispute, claim or litigation

**16 6  Other Relief.** Franchisor may obtain the remedy of injunctive relief without the posting of a bond if Franchisee violates its obligations regarding confidentiality, non-disclosure, transfer or limitations on the SaaS Solution use under this Agreement  Notwithstanding anything contained in this Agreement to the contrary each Party shall be entitled to seek injunctive or other equitable relief whenever the facts or circumstances would permit such Party to seek such equitable relief in a court of competent jurisdiction

**16 7  Modifications.** This Agreement may not be amended modified or rescinded except in writing signed by both Parties, and any attempt to do so shall be void and of no effect  This Agreement may be modified or amended only pursuant to a separate writing mutually agreed upon and signed by both Parties  The Parties expressly disclaim the right to claim the enforceability or effectiveness of (a) any oral modifications to this Agreement, and (b) any other amendments that are based on course of dealing, waiver, reliance, estoppel or other similar legal theory  The Parties expressly disclaim the right to enforce any rule of law that is contrary to the terms of this Section

**16.8  Governing Law; Exclusive Jurisdiction** The validity, construction and performance of this Agreement, and the legal relations among and any disputes between the Parties to this Agreement, shall be governed by and construed in accordance with the laws of the State of New Jersey, excluding that body of law applicable to conflicts of law that would apply the substantive law of another jurisdiction  Any suit or proceeding relating to this Agreement shall be brought only in the state and federal courts located in the State of New Jersey  The Parties hereby expressly consent to the exclusive personal jurisdiction of the New Jersey state courts situated in Morris County, New Jersey, and the United States District Court for the District of New Jersey  Each Party hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue with respect to any suit or proceeding brought under this Agreement

**16 9  Waiver.** If either Party fails to exercise any right or option at any time under this Agreement, such failure will not be deemed a waiver of the exercise of such right or option at any other time or the waiver of a different right or option  Termination of this Agreement by either Party will not waive Franchisee s obligation to make any payments to Franchisor under this Agreement

**16.10 Headings.** The division of this Agreement into sections and the use of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement  The terms "Agreement      herein      hereof,    hereunder    and similar expressions refer to this Agreement and not to any particular section or other portion hereof and include any Schedules or agreements supplemental hereto  Unless something in the subject matter or

context is inconsistent therewith, references herein to sections are to sections of this Agreement

**16 11 No Construction Against Drafter**  The Parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement

**16 12 Counterparts.**  This Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument

**16.13 Severability.**   If any provision of this Agreement is determined to be void or unenforceable, the provision shall be deemed severed from the Agreement and the remainder of this Agreement shall continue in full force and effect

**16 14 Successors and Assigns**  This Agreement shall inure to the benefit of and be binding upon the Parties, their successors and permitted assigns  Notwithstanding the above, Franchisee may not assign this Agreement without Franchisor's express written consent

**16 15 Mediation.**  The Parties agree that all disputes arising under this Agreement or associated with the SaaS Solution may be submitted to non-binding mediation under the National Franchise Mediation Program supervised by the Center for Public Resources (CPR) Institute for Dispute Resolution, 366 Madison Ave  New York  NY 10017, email  info@cpradr org

**16.16 Survival**   The provisions of this Agreement that due to their content should have continuing life shall survive the termination of this Agreement

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have executed or caused to be executed by their duly authorized representatives this Agreement as of the Effective Date

Franchisor
**Baymont Franchise Systems, Inc**

By _____
      Michael Piccola
      Senior Vice President
      Contracts Administration

Franchisee
**Tanzam LLC**

By _____
      Kirit Patel
      Manager

13

# SCHEDULE 1.1

## Definitions

**Access Credentials** means any user name identification number password license or security key, security token, PIN or other security code, method, technology or device used, alone or in combination, to verify End Users identity and authorization to access and use the SaaS Solution

**Affiliate** means any and all subsidiaries, affiliates corporations limited liability companies partnerships, firms, associations, businesses, organizations, and/or other entities that directly or indirectly (either presently or in the future and/or through one or more intermediaries) control, are controlled by, or are under common control with, the subject entity (with respect to Franchisor, including Franchisor s parent company, Wyndham Worldwide Corporation) and/or such entities

**Commitment Period** means five (5) years following the Acceptance Date

**Communication Services** means the Internet connectivity services Franchisee uses for purposes of accessing and using the SaaS Solution

**End User** means a person who is authorized by Franchisor, or who is otherwise permitted under this Agreement to access and use the SaaS Solution, including without limitation, Franchisee

**Facility** means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the effective date of the Franchisee Agreement

**Franchise Agreement** means the License or Franchise Agreement between Franchisee and Franchisor granting to Franchisee the non-exclusive right to operate the Facility under the System

**'Guest Information** means any names, e-mail addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including, without limitation, stay information that either Franchisor or Franchisee or a person acting on behalf of one or both of them receives from or on behalf of the other or any guest or customer of the Facility or any other Third Party

**Hardware** means the computer hardware peripheral equipment ancillary equipment the operating system software and related documentation that Franchisee uses for purposes of accessing and using the SaaS Solution

**Intellectual Property** means any and all rights existing from time to time under patent law copyright law, trademark law, trade secret law, and any other proprietary rights laws and regulations as well as any related applications, reissuances, continuations, continuations-in-part, divisionals, renewals, extensions, and restorations thereof, now or hereafter in force and effect anywhere in the world

**Permitted Use** means use of the SaaS Solution by End Users for the benefit of Franchisee solely in or for Franchisee s business operations as contemplated for and in accordance with the Franchise Agreement

"**Services** shall mean Additional Services  CRISP Services and Maintenance and Support Services

**System** means the comprehensive system for providing guest lodging facility services under the Marks as Franchisor specifies which, at present, includes only the following  (a) the Marks, (b) other intellectual

14

ocuSign Envelope ID  02885DC9 8C55      5BFD-7063E11CFE68

property including Confidential Information, System Standards Manual and know-how, (c) marketing, advertising, publicity, and other promotional materials and programs, (d) System Standards, (e) training programs and materials, (f) quality assurance inspection and scoring programs  and (g) the Reservation System

**Third Party**  means persons and entities other than Franchisor and Franchisee

## SCHEDULE 2.1

### The SaaS Solution

The SaaS Solution means the SynXis Property Management System  which as of the Effective Date includes the following features and functionality

- Web-based solution, which may include a local smart client
- Community model hosting by Sabre Hospitality Solutions, or an affiliate thereof
- Beginning 60-90 days from the Acceptance Date, interface with Infor s EzLITE automated rate audit system, which analyzes all PMS data to create property-specific, unconstrained demand models
  - The EzLITE system will offer daily recommendations regarding Best Available Rate ( **BAR** ) and stay control
    - Recommendations are based on 6 BAR rates entered by Franchisee
    - Franchisee must accept or override recommendations daily between specified hours, otherwise recommendations will be automatically uploaded into the SynXis Property Management System
- In-system training materials

16

cuSign Envelope ID  02885DC9 8C55-4     3BFD-7063E11CFE68

## SCHEDULE 2 3

### Implementation Services

Franchisor will offer Implementation Services consisting of assistance in installation/implementation of the SaaS Solution including the following

- Assistance with setup of two (2) Elavon tokenization terminals (to be provided in connection with execution of Elavon Agreement)
- Installation of SaaS Solution on up to two (2) work stations for Facility s front desk (Hardware to be provided by Franchisee)
- Training modules regarding features and functionality of SaaS Solution, including video demonstrations and tutorials
- Remote and optional on-site resources including training of Facility s staff

SynXis
Q2/17

cuSign Envelope ID 02885DC9 8C55-    BBFD 7063E11CFE68

## SCHEDULE 4.2

### CRISP Services

**Terms of CRISP Services**

Franchisee agrees to establish the best available rate 'BAR  provided however that Franchisee acknowledges and agrees that it will retain ultimate control over all rate audit decisions  Subject to the foregoing, Franchisee explicitly authorizes Franchisor to make adjustments to the Facility's rates inventory and restrictions in order to comply with the Required Policies and Practices without advance notice to Franchisee  Franchisor shall not, however, change the BAR without authorization from Franchisee  In addition Franchisee may modify or reverse any change Franchisor may make by notifying Franchisor, provided that such modification or reversal is consistent with the Required Policies and Practices  Franchisee s general manager shall be its primary representative who shall have the authority to make rate audit decisions for the Facility, unless Franchisee designates another Facility representative in writing to Franchisor  Franchisor may communicate with Franchisee s representative by telephone, e-mail or in another manner, and Franchisor may rely on any communication which Franchisor believes, in good faith  is from Franchisee s  representative  Any  know-how, algorithms, formulae  data, recommendations, documentation, software, or other materials or information that Franchisor furnishes to Franchisee in connection with the CRISP Services shall be deemed  Confidential Information  as defined in the Franchise Agreement and shall be subject to all prohibitions on disclosure, copying or use of Confidential Information under the Franchise Agreement

**Overview of CRISP Services**

Property Audit & Setup

In consultation with the Facility representative, simplify rates and room type structures by
- Verifying that all required rate plans are loaded correctly in the SaaS Solution,
- Verifying that local rates are available for sale in the distribution channels selected by the Facility,
- Verifying that all brand standard rate plans are available for sale, and
- Verifying that all hotel specific data is accurate and up to date in all systems

Rate & Inventory Management

Review inventory/rate visibility and consistency across all distribution channels  Key services include
- Monitoring Facility inventory and rate settings in the SaaS Solution,
- Identifying and advising Franchisee of erroneous rate plans,
- Monitoring rates across distribution channels and checking for accuracy in third party channels, and
- Coordinating participation in key corporate accounts and marketing programs
  .

cuSign Envelope ID 02885DC9 8C55--      BBFD-7063E11CFE68

## SCHEDULE 4.3

### Maintenance and Support Services

### First Level of Support

Franchisor will provide first-level support for the SaaS Solution, which shall include

- – SynXis Property Management System,
- – Infor s EZLITZE automated rate audit system, and
- – Any additional interfaces included in the SaaS Solution

Additionally  Franchisor shall field initial inquiries related to the Elavon Non-SaaS Solution Services though support therefor shall be provided as set forth in the Elavon Agreement

### Second Level of Support

In the event first level support fails to resolve any maintenance or support issues for the SaaS Solution, Franchisor will provide second level support by putting Franchisee in contact with the appropriate Third Party provider of the SaaS Solution

### Franchisee Obligations

Franchisee shall perform all user-required maintenance procedures specified by the vendor of the specific Hardware components, and obtain required maintenance only from an authorized service provider

19

cuSign Envelope ID 02885DC9-8C55 ·     3BFD-7063E11CFE68

## SCHEDULE 5 1

**Fees**

| | |
|---|---|
| **With up to Three Interfaces*** | $565 per month |
| **One-Time Start-Up Fee** | $1,400 |
| **One-Time Transfer Fee (if applicable)** | $500 |

    **\*   Interface**  means any interface you may choose to include  which may be necessary for features relating to  for example, voicemail, call accounting, etc   The Elavon tokenized credit card interface and Infor EzLITE interface are included in the monthly price listed above

SynXis
Q2/17

cuSign Envelope ID 02885DC9 8C55 ·    8BFD-7063E11CFE68

## SCHEDULE 6 1

### Minimum Technical Specification Requirements

1    Windows 8 or higher

2    4GB+ of RAM

3    2GHz processor (32 or 64 bit) or greater

4    1GB+ Available Disk Space

5    The Microsoft NET Framework Version 4 0

6    Internet Explorer 9 or Firefox 4 0 must be set as the default browser on the SaaS Solution

7    Screen resolution should be set to at least 1024x768

8    To save/view reports Acrobat 9 or higher is required (or compatible pdf reader)

9    Elavon Fusebox connectivity from two way interface

10   Elavon imaged Ingenico Swipe devices with outbound access to Fusebox

11   Elavon Webapp access (manual processing pop-up window)

SynAis
Q2/17

# EXHIBIT C

## **GUARANTY**

To induce Baymont Franchise Systems, Inc its successors and assigns ( you ) to sign the Franchise Agreement (the Agreement ) with the party named as the 'Franchisee to which this Guaranty is attached, the undersigned jointly and severally ( we  our  or  us ) irrevocably and unconditionally (i) warrant to you that Franchisee s representations and warranties in the Agreement are true and correct as stated  and (ii) guaranty that Franchisee's obligations under the Agreement including any amendments will be punctually paid and performed

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee  We waive notice of amendment of the Agreement  We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution and WAIVER OF JURY TRIAL, applies to this Guaranty

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement

GUARANTORS

DocuSigned by

_Kint Patel_
_____
428J6E3A0021482
Name  Kirit Patel
Address 42309 S Morrison Blvd, Hammond, LA 70403

DocuSigned by

_Ginsh Patel_
_____
83AF5DCF19C44E8
Name  Girish Patel
Address 42309 S Morrison Blvd, Hammond, LA 70403

DocuSigned by

_Archna Patel_
_____
CC0AA2BEB0D945C
Name  Archna Patel
Address 42309 S Morrison Blvd, Hammond, LA 70403

# EXHIBIT D

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this 8 15th day of March 2018, ("Amendment Date") by and between BAYMONT FRANCHISE SYSTEMS, INC., a Delaware corporation ("we", "us" or "our"), TANZAM LLC, a Louisiana limited liability company ("you", or "your") and KIRIT PATEL, GIRISH PATEL and ARCHNA PATEL (the "Guarantors"). This Amendment supplements that certain Franchise Agreement dated February 8, 2018, (the "Franchise Agreement"), relating to your development of a Baymont® Chain Facility to be located at 42309 S Morrison Blvd, Hammond, LA 70403, which is designated as Unit #02002-11589-06 (the "Facility").  Terms not otherwise defined in the Amendment shall be defined as provided in the Franchise Agreement.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.   Schedule B of the Franchise Agreement is hereby amended to read as follows:

Part I:       YOUR OWNERS

| Name | Ownership Percentage | Type of Equity Interest |
|------|----------------------|-------------------------|
| Archna Patel | 45% | member |
| Girish Patel | 45% | member |
| Kirit Patel | 10% | member |

2.   Confidentiality. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available fro that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

3.   Release. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directo4, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the Franchise Agreement for the Facility.

4.   Except as expressly stated in this Amendment, no further additions, modification o deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

5.   Execution in Counterparts.  To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts.  All counterparts shall collectively constitute a single agreement.  It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

BAYMONT FRANCHISE SYSTEMS, INC.,

By: _____
    Michael Piccola, SVP

TANZAM LLC

By: _____
    Kirit Patel
    Manager

GUARANTORS:

By: _____
    Kirit Patel

By: _____
    Girish Patel

By: _____
    Archna Patel

# EXHIBIT E



**WYNDHAM**
HOTELS & RESORTS

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

December 21, 2023

**VIA ELECTRONIC MAIL AND UPS**
baymontinn02002@gmail.com

Mr. Kirit Patel
Tanzam LLC
42309 S Morrison Blvd.
Hammond, LA 70403

RE:   **ACKNOWLEDGMENT OF TERMINATION** of the Franchise Agreement for Baymont® by
Wyndham System Unit #02002-11589-06 located in Hammond, LA (the "Facility")

Dear Mr. Patel:

Baymont Franchise Systems, Inc. ("we", "our" or "us") has received an email dated December 12, 2023, advising us that on November 29, 2023, (the "Termination Date"), Tanzam LLC ("you" or "your") sold the Facility, resulting in the termination of the Franchise Agreement, dated February 8, 2018 (the "Agreement"). Accordingly, your license to operate the Facility in the Baymont System has terminated on the Termination Date.

While we have been working in good faith with the new owner in an effort to secure a long-term agreement to continue the Facility's affiliation with the Baymont Chain, our efforts have not been successful. We regret that the Facility will no longer operate as a Baymont facility and must now require you to fulfill the post-termination obligations set forth in the Agreement, including the payment of liquidated damages.

As a result of your premature termination of the Agreement, you are required to pay Liquidated Damages in the amount of $59,000 as provided in Section 18.2 of the Agreement. You are also responsible to pay us all outstanding Recurring Fees and other charges within ten (10) days. We estimate that, as of the Termination Date, you owe us $25,916.56 in Recurring Fees. We have enclosed an itemized statement detailing the Recurring Fees and other charges. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantor.

In addition, you apparently failed to de-identify the Facility before conveying title and relinquishing control of the Facility to the new owner. If we must file suit to force the new owner to de-identify the Facility, we reserve the right to include a claim in that action against you for contributory infringement and dilution under the applicable federal trademark statutes.

Please know that, because the Agreement has terminated, you have also lost the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. Please be advised that due to the termination you will have no functionality from the system. If the Facility has a SynXis system installed and you wish to continue using an independent version of the software, please contact Sabre at 877-520-3646. If the Facility has an Opera system installed and you wish to continue using an independent version of the software, please contact Brad Eckensberger at 214-914-8855. Further, you will also lose access to additional accounts, such as Oracle Hospitality Integration Platform (OHIP) and












Mr. Kirit Patel
December 21, 2023
Page Two

Reporting and Analytics (R&A).  Please see the attached Opera Cloud Termination – PMS Best Practices for next steps.  If your property is planning to migrate to another property management system, please contact your provider to expedite the installation.  If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2504 to obtain reporting of that data.

Should you have any questions regarding this matter, please contact Dawn Whitley, Senior Director of Franchise Services, at (973) 753-7481 or at Dawn.Whitley@wyndham.com.

Sincerely,

Suzanne Fenimore
Vice President
Contracts Compliance

Enclosure

cc:     Archna Patel (Guarantor)
        Girish Patel (Guarantor)
        Kirit Patel (as Guarantor)
        Shilpan Patel
        Greg Giordano
        Joe Maida
        Dawn Whitley

Tanzam LLC
42309 SOUTH MORRISON BLVD.,
I-55 & I-12, HAMMOND,
LA 70403, United States



**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

Baymont Franchise Systems, Inc.
22 Sylvan Way
Parsippany NJ 07054

Payment Terms:  30 Days from date of invoice          Account Number    02002-11589-06-BAY                         Statement as of:  30-NOV-2023

| Period | Invoice Date | Invoice Number | Invoice Description | Amount Billed (USD) | Tax | Finance Charges | Amount Applied/ Credited | Adjustment | Total (USD) |
|--------|--------------|----------------|--------------------|--------------------|-----|-----------------|--------------------------|------------|-------------|
| MAY-23 | 05/31/2023 | 46019327 | Actual-MARKETING FEE | 796.24 | 0.00 | 64.88 | 0.00 | 0.00 | 861.12 |
| | 05/31/2023 | 46019326 | Actual-RESERVATION FEE | 597.18 | 0.00 | 48.69 | 0.00 | 0.00 | 645.87 |
| | 05/31/2023 | 46019325 | Actual-ROYALTY FEE | 1,990.60 | 0.00 | 80.94 | 1,786.34 | 0.00 | 285.20 |
| | 05/31/2023 | 45992463 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 40.17 | 0.00 | 0.00 | 661.17 |
| | | | **Total MAY-23** | **4,005.02** | **0.00** | **234.68** | **1,786.34** | **0.00** | **2,453.36** |
| JUN-23 | 06/02/2023 | 11257791 | GUEST SATISFACTION- WYNREWARDS | 12.00 | 0.00 | 0.88 | 0.00 | 0.00 | 12.88 |
| | 06/02/2023 | 11257111 | GUEST SRVCS TRANSACTION CHARGE | 195.00 | 0.00 | 14.24 | 0.00 | 0.00 | 209.24 |
| | 06/27/2023 | 32943265 | GDS INTERNET CONNECTIVITY FEE MAY 2023 | 180.00 | 0.00 | 12.24 | 0.00 | 0.00 | 192.24 |
| | 06/27/2023 | 551001 | WYNREWARDS 5% DISCOUNT: 0.75% | -65.90 | 0.00 | 0.00 | 0.00 | 0.00 | -65.90 |
| | 06/30/2023 | 46045694 | Actual-MARKETING FEE | 750.16 | 0.00 | 49.44 | 0.00 | 0.00 | 799.60 |
| | 06/30/2023 | 46045693 | Actual-RESERVATION FEE | 562.62 | 0.00 | 37.09 | 0.00 | 0.00 | 599.71 |
| | 06/30/2023 | 46045692 | Actual-ROYALTY FEE | 1,875.40 | 0.00 | 123.62 | 0.00 | 0.00 | 1,999.02 |
| | 06/30/2023 | 46025628 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 41.32 | 0.00 | 0.00 | 662.32 |
| | | | **Total JUN-23** | **4,130.28** | **0.00** | **278.83** | **0.00** | **0.00** | **4,409.11** |
| JUL-23 | 07/25/2023 | 32959085 | GDS INTERNET CONNECTIVITY FEE June 2023 | 194.00 | 0.00 | 10.48 | 0.00 | 0.00 | 204.48 |
| | 07/27/2023 | 554969 | WYNDHAM REWARDS 5% | 552.17 | 0.00 | 29.26 | 0.00 | 0.00 | 581.43 |
| | 07/27/2023 | 554825 | WYNREWARDS 5% DISCOUNT: 0.75% | -77.38 | 0.00 | 0.00 | 0.00 | 0.00 | -77.38 |
| | 07/27/2023 | 554826 | WYNREWARDS ENROLLMENT FEE CR | -36.45 | 0.00 | 0.00 | 0.00 | 0.00 | -36.45 |
| | 07/31/2023 | 46079877 | Actual-MARKETING FEE | 731.90 | 0.00 | 37.28 | 0.00 | 0.00 | 769.18 |
| | 07/31/2023 | 46079876 | Actual-RESERVATION FEE | 548.93 | 0.00 | 27.96 | 0.00 | 0.00 | 576.89 |
| | 07/31/2023 | 46079875 | Actual-ROYALTY FEE | 1,829.75 | 0.00 | 93.22 | 0.00 | 0.00 | 1,922.97 |
| | 07/31/2023 | 46052862 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 31.69 | 0.00 | 0.00 | 652.69 |
| | | | **Total JUL-23** | **4,363.92** | **0.00** | **229.89** | **0.00** | **0.00** | **4,593.81** |
| AUG-23 | 08/02/2023 | TD3248298 | DIGITAL PFP | 31.73 | 0.00 | 1.35 | 0.00 | 0.00 | 33.08 |
| | 08/02/2023 | TM3248298 | MEMBER BENEFIT COMMISSION | 9.72 | 0.00 | 0.42 | 0.00 | 0.00 | 10.14 |
| | 08/02/2023 | TR3248298 | TMC / CONSORTIA PFP FEES | 50.55 | 0.00 | 2.15 | 0.00 | 0.00 | 52.70 |
| | 08/25/2023 | 556604 | WYNDHAM REWARDS 5% | 494.32 | 0.00 | 19.02 | 0.00 | 0.00 | 513.34 |
| | 08/25/2023 | 556139 | WYNREWARDS 5% INCREASE: 0.50% | 48.18 | 0.00 | 1.86 | 0.00 | 0.00 | 50.04 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 08/25/2023 | 556608 | WYNREWARDS ENROLLMENT FEE CR | -16.06 | 0.00 | 0.00 | 0.00 | 0.00 | | -13.00 |
| | 08/30/2023 | 32978106 | GDS INTERNET CONNECTIVITY FEE July 2023 | 250.00 | 0.00 | 9.01 | 0.00 | 0.00 | | 259.01 |
| | 08/31/2023 | 46109232 | Actual-MARKETING FEE | 528.84 | 0.00 | 18.77 | 0.00 | 0.00 | | 547.61 |
| | 08/31/2023 | 46109231 | Actual-RESERVATION FEE | 396.63 | 0.00 | 14.08 | 0.00 | 0.00 | | 410.71 |
| | 08/31/2023 | 46109227 | Actual-ROYALTY FEE | 1,322.10 | 0.00 | 46.93 | 0.00 | 0.00 | | 1,369.03 |
| | 08/31/2023 | 46082272 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 22.06 | 0.00 | 0.00 | | 643.06 |
| | | | **Total AUG-23** | **3,740.07** | **0.00** | **135.65** | **0.00** | **0.00** | | **3,875.72** |
| SEP-23 | 09/05/2023 | TD3255530 | DIGITAL PFP | 93.84 | 0.00 | 2.40 | 0.00 | 0.00 | | 96.24 |
| | 09/05/2023 | TM3255530 | MEMBER BENEFIT COMMISSION | 10.71 | 0.00 | 0.27 | 0.00 | 0.00 | | 10.98 |
| | 09/05/2023 | TC3255530 | TA COMMISSION SERVICE CHARGE | 10.87 | 0.00 | 0.27 | 0.00 | 0.00 | | 11.14 |
| | 09/05/2023 | TR3255530 | TMC / CONSORTIA PFP FEES | 6.63 | 0.00 | 0.17 | 0.00 | 0.00 | | 6.80 |
| | 09/05/2023 | TA3255530 | TRAVEL AGENT COMMISSIONS | 61.75 | 0.00 | 1.58 | 0.00 | 0.00 | | 63.33 |
| | 09/08/2023 | 32985777 | WYNDHAM REWARDS 5% CREDIT | -9.99 | 0.00 | 0.00 | 0.00 | 0.00 | | -9.99 |
| | 09/26/2023 | 557431 | WYNDHAM REWARDS 5% | 279.81 | 0.00 | 6.30 | 0.00 | 0.00 | | 286.11 |
| | 09/26/2023 | 559385 | WYNREWARDS 5% INCREASE: 0.50% | 26.82 | 0.00 | 0.60 | 0.00 | 0.00 | | 27.42 |
| | 09/26/2023 | 559386 | WYNREWARDS ENROLLMENT FEE CR | -11.85 | 0.00 | 0.00 | 0.00 | 0.00 | | -11.85 |
| | 09/27/2023 | 33019906 | GDS INTERNET CONNECTIVITY FEE August 2023 | 296.00 | 0.00 | 6.51 | 0.00 | 0.00 | | 302.51 |
| | 09/30/2023 | 46141779 | Accrual-MARKETING FEE | 359.79 | 0.00 | 7.38 | 0.00 | 0.00 | | 367.17 |
| | 09/30/2023 | 46141778 | Accrual-RESERVATION FEE | 269.84 | 0.00 | 5.53 | 0.00 | 0.00 | | 275.37 |
| | 09/30/2023 | 46141777 | Accrual-ROYALTY FEE | 899.48 | 0.00 | 18.44 | 0.00 | 0.00 | | 917.92 |
| | 09/30/2023 | 46119721 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 12.74 | 0.00 | 0.00 | | 633.74 |
| | | | **Total SEP-23** | **2,914.70** | **0.00** | **62.19** | **0.00** | **0.00** | | **2,976.89** |
| OCT-23 | 10/03/2023 | TP3262732 | AAA PROGRAM COMMISSION | 52.16 | 0.00 | 0.60 | 0.00 | 0.00 | | 52.76 |
| | 10/03/2023 | TD3262732 | DIGITAL PFP | 15.47 | 0.00 | 0.18 | 0.00 | 0.00 | | 15.65 |
| | 10/03/2023 | TC3262732 | TA COMMISSION SERVICE CHARGE | 23.44 | 0.00 | 0.27 | 0.00 | 0.00 | | 23.71 |
| | 10/03/2023 | TA3262732 | TRAVEL AGENT COMMISSIONS | 7.20 | 0.00 | 0.08 | 0.00 | 0.00 | | 7.28 |
| | 10/23/2023 | 33032007 | GDS INTERNET CONNECTIVITY FEE September 2023 | 214.00 | 0.00 | 1.93 | 0.00 | 0.00 | | 215.93 |
| | 10/24/2023 | 560741 | WYNDHAM REWARDS 5% | 206.17 | 0.00 | 1.75 | 0.00 | 0.00 | | 207.92 |
| | 10/24/2023 | 560633 | WYNREWARDS 5% INCREASE: 0.50% | 19.58 | 0.00 | 0.17 | 0.00 | 0.00 | | 19.75 |
| | 10/24/2023 | 560634 | WYNREWARDS ENROLLMENT FEE CR | -10.35 | 0.00 | 0.00 | 0.00 | 0.00 | | -10.35 |
| | 10/31/2023 | 46168243 | Accrual-MARKETING FEE | 602.24 | 0.00 | 3.01 | 0.00 | 0.00 | | 605.25 |
| | 10/31/2023 | 46168242 | Accrual-RESERVATION FEE | 451.68 | 0.00 | 2.26 | 0.00 | 0.00 | | 453.94 |
| | 10/31/2023 | 46168241 | Accrual-ROYALTY FEE | 1,505.61 | 0.00 | 7.53 | 0.00 | 0.00 | | 1,513.14 |
| | 10/31/2023 | 46143476 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 3.11 | 0.00 | 0.00 | | 624.11 |
| | | | **Total OCT-23** | **3,708.20** | **0.00** | **20.89** | **0.00** | **0.00** | | **3,729.09** |
| NOV-23 | 11/02/2023 | TD3270437 | DIGITAL PFP | 3.68 | 0.00 | 0.00 | 0.00 | 0.00 | | 3.68 |
| | 11/27/2023 | 562923 | WYNDHAM REWARDS 5% | 632.75 | 0.00 | 0.00 | 0.00 | 0.00 | | 632.75 |
| | 11/27/2023 | 561794 | WYNREWARDS 5% INCREASE: 0.50% | 60.76 | 0.00 | 0.00 | 0.00 | 0.00 | | 60.76 |
| | 11/27/2023 | 561795 | WYNREWARDS ENROLLMENT FEE CR | -25.53 | 0.00 | 0.00 | 0.00 | 0.00 | | -25.53 |
| | 11/28/2023 | 33052817 | GDS INTERNET CONNECTIVITY FEE October 2023 | 282.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 282.00 |

| 11/30/2023 | 46205504 | Accrual-MARKETING FEE | 524.45 | 0.00 | 0.00 | 0.00 | 0.00 | 524.45 |
| 11/30/2023 | 46205503 | Accrual-RESERVATION FEE | 393.34 | 0.00 | 0.00 | 0.00 | 0.00 | 393.34 |
| 11/30/2023 | 46205502 | Accrual-ROYALTY FEE | 1,311.13 | 0.00 | 0.00 | 0.00 | 0.00 | 1,311.13 |
| 11/30/2023 | 46173676 | CONTINUING EDUCATION FEE | 75.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75.00 |
| 11/30/2023 | 46174978 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 0.00 | 0.00 | 0.00 | 621.00 |
| | | **Total NOV-23** | **3,878.58** | **0.00** | **0.00** | **0.00** | **0.00** | **3,878.58** |
| | | **Total Outstanding:** | **26,740.77** | **0.00** | **962.13** | **1,786.34** | **0.00** | **25,916.56** |



Baymont Franchise Systems, Inc.
22 Sylvan Way
Parsippany NJ 07054

**PAYMENT OPTIONS**

**BY WIRE TRANSFER**: Please ensure all transfers costs are settled by yourselves. Please quote the invoice and account number with payment and transfer to:

| | | |
|---|---|---|
| Bank | : | Bank of America |
| Branch Address | : | 100 West 33rd Street<br>New York, NY 10001 |
| Account Name | : | Baymont Franchise Systems, Inc. |
| Bank Account Number | : | 4426228831 |
| ABA | : | 026009593 |
| Swift Code | : | BOFAUS3N |

**REMIT CHECKS TO:**

Baymont Franchise Systems, Inc.
14227 Collections Center Drive
Chicago, IL 60693

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

**Additional Information:**

Thank you in advance for your prompt payment and continued business
Please note accrual invoices on your account are estimates and can't be paid until actual revenues are reported
Please ensure you promptly submit your actual revenues and rooms sold in Wynpay

**Contact information:**

For supporting invoice details please visit WynPay and/or Wyndham Community.  For questions please call 1-855-849-3487 or email Financial.Services@wyndham.com